THE CHICAGO DAILY NEWS COMPANY *et al.*

*v.*

FERDINAND SIEGEL *et al.*

*Opinion filed December 22, 1904.*

1. EVIDENCE—*when delivery of release is evidence of performance.* If a release is authorized to be delivered upon the performance of certain conditions, the fact of its delivery furnishes strong proof that the conditions were performed.

2. CREDITORS' BILLS—*a subsequent creditor cannot attack prior settlement.* Only those creditors whose claims existed at the time an indebtedness owing to their debtor from a third party was settled can maintain a bill attacking such settlement as in fraud of their rights.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. JOHN GIBBONS, Judge, presiding.

This is a creditor's bill, filed on October 12, 1899, in the circuit court of Cook county by the Chicago Daily News Company, an Illinois corporation, and Victor F. Lawson individually, and Edwin S. Osgood and Frederick S. Osgood as co-partners under the firm name of Osgood & Co., against the Simmons Company, and Ferdinand Siegel and Joseph Siegel of the firm of F. Siegel & Bros., setting up the recovery of judgments in favor of the complainants against the Simmons Company, the issuance of executions thereon, and the returns of said executions unsatisfied, the judgment in favor of the Chicago Daily News Company having been

rendered on June 22, 1898, for the sum of $3921.50 and costs; the judgment in favor of Victor F. Lawson having been rendered on November 29, 1898, for the sum of $184.00 and costs before a justice of the peace of Cook county, a transcript whereof was filed in said circuit court on December 15, 1898; and the judgment in favor of Osgood & Co. having been rendered on December 7, 1898, for the sum of $718.40 and costs. A joint and several answer was filed by Ferdinand and Joseph Siegel, to which a replication was filed by the complainants. The cause was referred to a master in chancery to take the testimony, and report his conclusions. The master made a report adversely to the claims of the complainants below, plaintiffs in error here, and recommended that the bill be dismissed. Upon the coming in of the master's report, and the hearing upon exceptions thereto, the chancellor sustained the exceptions, and rendered a decree in favor of plaintiffs in error against the defendants in error, Ferdinand Siegel and Joseph Siegel, for the sum of $4361.05 and costs. Upon appeal to the Appellate Court, the Appellate Court reversed the decree of the circuit court, and remanded the cause to that court, with directions to it to affirm the master's report, and enter a decree dismissing the bill for want of equity. The present writ of error is sued out for the purpose of reviewing the judgment, so entered by the Appellate Court.

The bill charged upon information and belief that Ferdinand and Joseph Siegel, doing business under the firm name of F. Siegel & Bros., in Chicago, were largely indebted to the Simmons Company in the sum of, to-wit, $11,000.00, or in goods to the value of $11,000.00.

The material facts are substantially as follows: The Simmons Company was engaged in 1897 in the mercantile business in the city of Chicago, and Ferdinand Siegel and Joseph Siegel were doing business in that city under the firm name of F. Siegel & Bros. The Siegels were the principal stockholders in a corporation, conducting a department store

at the corner of State and Adams streets in Chicago, and, during the year 1896 and in the beginning of the year 1897, negotiated with William A. Simmons for the sale of the business of the concern, known as The Grand, to said Simmons, or to a corporation which was to be organized by him. The Siegels owned a majority of the capital stock of the corporation, known as The Grand, so engaged in business at the corner of State and Adams streets in Chicago, and the remaining shares of stock therein were owned by Maximilian Philipsborn, who was then, and had been for a number of years, manager of The Grand. The corporation, so formed by said Simmons, was the defendant, the Simmons Company, and all of the stock in it was owned by William A. Simmons, except one share, which was held by his son, Howard P. Simmons, and one share, which was held by his attorney, John C. Stetson. In pursuance of said negotiations a contract was entered into on January 20, 1897, between Howard P. Simmons and the corporation, known as The Grand, through its president F. Siegel, and its secretary, M. Philipsborn, by the terms of which contract all of the merchandise, leasehold interests, good will, and property of The Grand was to be sold to the corporation, so to be organized by W. A. Simmons. The property was to be taken in the name of Howard P. Simmons from The Grand as a matter of convenience, until the new corporation, the Simmons Company, should be organized. When the corporation, known as the Simmons Company, was organized, all of the assets and property, which, by the contract between Howard P. Simmons and The Grand, were to be turned over to Howard P. Simmons, were turned over and vested in the Simmons Company, and all rights under the contract became the rights and property of the Simmons Company, and the said contract became a part of the assets of that company.

By the terms of the contract, Howard P. Simmons and wife were to execute a deed to The Grand of sub-lot 8 in subdivision of lot 71 in the east part of Ellis' addition to

Chicago, together with the improvements thereon, known as the Cambridge Apartment Building, and the household furniture therein contained, subject to a trust deed for $75,-000.00, together with a bill of sale of the furniture therein, and the rentals to accrue therefrom from January 20, 1897, and also a certain block 44 in Cornell, subject to an encumbrance of about $5500.00 thereon, and was to pay to The Grand a certain sum of money, and execute a certain number of notes, and was also to pay the Siegels for leases of the premises, on which the business of The Grand was conducted, known as 202 and 204 State street, and 64 Adams street, and 66 to 72 Adams street, and to pay the rents for said premises according to the terms of said leases; and The Grand agreed to deliver a bill of sale of all the merchandise upon said premises, belonging to it, at cost price, and at such price such other merchandise as should be billed to The Grand from its stores in Kansas City, Mo., St. Louis, Mo., and Detroit, Mich., all of which merchandise was to be delivered to The Grand on or before February 1, 1897, and to aggregate in amount as per invoices the sum of $75,000.00, exclusive of fixtures and improvements; and an additional amount of stock, as per invoices from F. Siegel & Bros., was to be delivered by F. Siegel & Bros. at said store in an amount of $20,000.00, which said merchandise was to be delivered by F. Siegel & Bros. on or before May 1, 1897.

In addition to said contract between the Simmons Company and Howard P. Simmons, a supplemental agreement of the same date, to-wit, January 20, 1897, was made between F. Siegel & Bros. and Howard P. Simmons, by the terms of which Siegel & Bros. agreed to deliver to the Simmons Company or Howard P. Simmons, $20,000.00 in merchandise, referred to in the contract between The Grand and Simmons, to be selected by M. Philipsborn, but it was therein provided that, in case the merchandise in The Grand should be in excess of $75,000.00, then the merchandise to be delivered by Siegel & Bros. should be reduced in amount

by the same amount The Grand merchandise should be in excess of $75,000.00, as Siegel & Bros. were not to deliver any more goods than was sufficient to make up the stock to $95,000.00, and if the said stock should inventory over $75,000.00, then the Siegels were to deliver so much less on their $20,000.00 contract.

On January 30, 1897, a paper was executed by The Grand by its president, Ferdinand Siegel, and its secretary, M. Philipsborn, wherein after referring to the contract between The Grand and Howard P. Simmons bearing date January 20, 1897, whereby The Grand agreed to make a bill of sale to Howard P. Simmons of the merchandise then in its premises, and other merchandise from the places above named, it was recited that The Grand thereby executed and delivered a bill of sale for all merchandise, contained in its premises, and other merchandise, in compliance with the contract of January 20, 1897, placed in the said Grand, or delivered to said Howard P. Simmons; an itemized account of which merchandise, according to the inventory, amounted to $70,638.95, leaving an amount of merchandise, yet to be delivered under said contract to be called for by Howard P. Simmons, of the sum of $4361.05, as per bills to be delivered by F. Siegel & Bros., etc.

On May 10, 1897, W. A. Simmons by H. P. Simmons his attorney in fact, and H. P. Simmons executed the following receipt, to-wit: "For one dollar and other good and valuable considerations the obligation of F. Siegel & Bros. to furnish further goods under their original contract with W. A. and H. P. Simmons is herewith canceled and annulled."

On October 10, 1897, the Simmons Company executed two chattel mortgages to the defendants, Siegel, for indebtedness then existing from the Simmons Company to said defendants, one of the said mortgages being for the sum of $41,118.32, and the other for $1666.66, aggregating $42,-784.98.

THERON DURHAM, for plaintiffs in error.

BINSWANGER & JACKSON, for defendants in error.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The plaintiffs in error by their creditor's bill seek to reach an alleged indebtedness, amounting to $11,748.18, charged to have been due from the defendants in error, Ferdinand Siegel and Joseph Siegel, to the judgment debtor, the Simmons Company. Of this amount the sum of $4361.05 is alleged to be due from the Siegels to the Simmons Company under the contract of January 20, 1897, between Howard P. Simmons and The Grand for the undelivered balance of the goods, amounting to $75,000.00, which were to be delivered by The Grand by the terms of that contract. The remainder of the sum of $11,748.18, to-wit, the sum of $7387.13, is the amount, alleged to be due from the Siegels to the Simmons Company under the contract for $20,000.00, set forth in the statement preceding this opinion. In other words, it is conceded, as we understand the evidence, that on or about May 1, 1897, the Siegels owed the Simmons Company under the $75,000.00 contract the sum of $4361.05, and under the $20,000.00 contract the sum of $7387.13, the goods described in the former contract being spoken of in the evidence as the "old goods," amounting to $4361.05, and the goods described in the latter contract being spoken of in the evidence as the "new goods," amounting to $7387.13.

The only question, involved in this case, is a question of fact, and that question of fact is, whether, at the time this creditor's bill was filed, the defendants in error owed anything to the judgment debtor, the Simmons Company. The plaintiffs in error, the judgment creditors, contend that the defendants in error were indebted to the Simmons Company on account of said contract, in that they had not delivered to the Simmons Company all the merchandise, which they

agreed to deliver to said Simmons; on the other hand, defendants in error claim that they have fully performed their contracts in all respects, and have delivered to the Simmons Company all merchandise, required by the contracts to be delivered by them. The defendants in error also claim that a full settlement of all accounts under said contracts has been had between them and the Simmons Company, and that the Simmons Company is indebted to them upon other accounts.

Defendants in error insist that, on or before May 10, 1897, they delivered to the Simmons Company all the goods, which they were required to deliver under their contracts, and thereby discharged said indebtedness of $11,748.18. The evidence shows, as will be hereafter stated, that at that time the defendants in error delivered to the Simmons Company goods worth from $10,000.00 to $12,000.00, or worth, according to some of the testimony, from $15,000.00 to $16,-000.00. Defendants in error insist that the goods, so delivered to the Simmons Company, were delivered in payment of the amounts due under both contracts, that is, $4361.05 due for "old goods" under one contract, and $7387.13 due for "new goods" under the other contract.

The contention, thus made by the defendants in error, is, in our opinion, sustained by the great preponderance of the evidence. Joseph Siegel and Maximilian Philipsborn, the latter having been manager for Siegel & Bros. and subsequently for the Simmons Company, both swear that goods to the amount of between $10,000.00 and $12,000.00 were so delivered in May, 1897, to discharge the balance due under both contracts. They are sustained by the testimony of three other witnesses, to-wit, Alfred Husch, H. M. Ellinger, and Lizzie P. Miles. The testimony of these five witnesses is clear and positive, that the goods were delivered upon trucks, belonging to the defendants in error, to the Simmons Company. The only testimony, which contradicts that of these five witnesses, is the testimony of W. A. Simmons, and his son, H. P. Simmons. While the testimony of H. P. Sim-

mons, given in rebuttal, is to the effect that no goods were delivered to the Simmons Company in discharge of the balance due upon these contracts, yet the force of his evidence is much weakened by the statement, made by him upon his first examination in the case. Upon his first examination he stated that the Simmons Company received merchandise from defendants in error after May, 1897, and up to July, but that he did not know whether the merchandise so received was under the agreement or not. He also stated upon said first examination that he did not know whether or not the Siegels were in any manner indebted either to him, or to the Simmons Company, for anything after the release or receipt of May 10, 1897, set forth in the statement preceding this opinion, was executed by him, and given to the defendants in error. The following question was asked him in reference to said paper, and the following answer was given by him: "Q. At the time this paper was given by you to the Siegels were the Siegels indebted to you, or your father?—A. No, sir." Here is a positive statement on the part of H. P. Simmons that the defendants in error were not indebted to him, or his father, on the 10th of May, 1897.

The testimony of W. A. Simmons contradicts that of Joseph Siegel and M. Philipsborn and the other of the five witnesses above named, but he admits that his negotiations for a settlement with Joseph Siegel were finished on May 9, and that he left Chicago for New York on May 10, and did not actually see the delivery of the goods, whose delivery is testified to by witnesses, who did see such delivery.

The evidence shows conclusively that, between May 6 and May 10, 1897, a settlement of the indebtedness was made between Joseph Siegel and W. A. Simmons. They differ as to the terms of the settlement, but their evidence does not conflict as to the fact of the making of the settlement. W. A. Simmons swears, in substance, that he had interviews with Joseph Siegel at the latter's store on several different days prior to May 10, 1897, and that it was there agreed be-

tween them that the Siegels were to deed back to the Simmonses, or to the Simmons Company, block 44, mentioned in the statement preceding this opinion, and to turn over to Simmons what were called the Montgomery notes, and pay $225.00 in money, and that the Simmonses or the Simmons Company were to cancel the obligation of F. Siegel & Bros. to deliver the balance due for "new goods," to-wit, $7387.13; but that Siegel & Bros. were to pay at once the balance due for "old goods," to-wit, $4361.05, or deliver at once "old goods" to that amount in value; that, upon receipt of these old goods to the amount of $4361.05, the Simmons Company was to cancel the obligations of F. Siegel & Bros. as above stated, and give two notes due in four months for rent then due from the Simmons Company to F. Siegel & Bros.; and it was also agreed at the same time that F. Siegel & Bros. were to stand by the Simmons Company, and supply them with money necessary to carry on their business until the fall of 1897. It is admitted by W. A. Simmons & Co. that the defendants in error kept faith in this regard, and did furnish them money as agreed to carry on their business. It will thus be noticed that a settlement was agreed upon, and that the difference between Joseph Siegel and W. A. Simmons as to the terms of that settlement is that, according to W. A. Simmons, part of the goods was to be delivered and the obligation to deliver the balance was to be canceled, while Joseph Siegel, who is confirmed by Philipsborn, testifies that all the indebtedness for outstanding merchandise was to be settled by the delivery of the job lot of goods, amounting to between $10,000.00 and $12,000.00, and that such goods were delivered. The testimony of W. A. Simmons is to the effect that the Siegels were to be released from the obligation to deliver "new goods" under the $20,000.00 contract, the amount of such new goods being $7387.13, upon condition that the Siegels would deliver at once to the Simmons Company "old goods," amounting in value to $4361.05, and would re-convey block 44, and de-

liver up the Montgomery notes, and pay $225.00 in cash, etc.; and he claims that the Siegels failed to deliver "old goods" to the amount of $4361.05 as agreed, and that, therefore, the release did not operate to extinguish their obligation to deliver "new goods" to the amount of $7387.13, and, as a consequence, that their indebtedness amounts to the whole sum of $11,748.18. It makes but little difference whether the theory of W. A. Simmons is correct, or whether the theory of Joseph Siegel is correct, so far as the result is concerned. The evidence shows that on or before May 10, 1897, a large quantity of goods to the amount of from $10,-000.00 to $12,000.00 was actually delivered by the defendants in error to the Simmons Company. If those goods were delivered in discharge of the whole amount due for undelivered goods, to-wit, $11,748.18, then the defendants in error are not indebted in any amount to the Simmons Company. But if those goods were delivered in discharge of the obligation to deliver "old goods" to the amount of $4361.05, then it is still true that no indebtedness exists from the defendants in error to the Simmons Company because, upon delivering "old goods" to the amount of $4361.05, and doing the other things above named, they were, under the arrangement as interpreted by W. A. Simmons, to be released from the obligation to deliver the new goods to the amount of $7387.13.

The testimony of the defendants in error upon this subject is confirmed by several significant circumstances. In the first place, on May 10, 1897, H. P. Simmons, for himself and as attorney in fact for his company, executed a release to the defendants in error, and thereby recited that "for one dollar and other good and valuable considerations the obligation of F. Siegel & Bros. to furnish further goods under their original contract with W. A. and H. P. Simmons is herewith canceled and annulled." That release was executed by Howard P. Simmons in pursuance of a letter of instruction, received from his father and bearing date on Sunday,

May 9, 1897. In the letter of May 9, 1897, W. A. Simmons says to his son: "On the receipt of the above we are to cancel their obligations, or our order for further goods under the original contract," etc. "The above" refers to the delivery of the old goods, amounting to $4361.05, and to the re-conveyance of block 44, and the surrender of the Montgomery notes, and the payment of $225.00, etc. That is to say, when old goods to the amount of $4361.05 were delivered and these other things were done, then H. P. Simmons was authorized by his father to execute a release to the defendants in error of their obligation to deliver further goods. The fact, that the release was executed and delivered, confirms the testimony introduced by the defendants in error that goods were delivered in discharge of their indebtedness under these contracts. Where a release is authorized to be delivered upon the performance of certain conditions, then the fact of the delivery is almost indisputable proof that the conditions have been performed. H. P. Simmons and his father were shrewd, practical business men, and it is difficult to understand why a release of an obligation to deliver goods to the amount of $7387.13 was executed and delivered if all the conditions, upon which such delivery was to be made, including the delivery of "old goods" to the amount of $4361.05, were not actually performed. As we understand the contentions of the parties, it is not denied that the defendants in error re-conveyed block 44 and did all the other things specified, except the delivery of "old goods" to the amount of $4361.05. Such delivery alone, of the things agreed to be done, is not admitted by plaintiffs in error.

In the second place, on October 10, 1897, the Simmons Company failed and executed chattel mortgages upon all its property to the amount of over $42,000.00 to the defendants in error to secure an indebtedness to that amount, which then existed from the Simmons Company to the defendants in error. This indebtedness of $42,000.00 was for rent due under the leases that had been transferred by the Siegels to

the Simmons Company, or the Simmonses, and for money advanced and loaned by the Siegels to the Simmons Company, and for merchandise sold by the Siegels to the Simmons Company after May 10, 1897. It is admitted that these chattel mortgages for over $42,000.00 included an indebtedness from the Simmons Company to the defendants in error for goods to the amount of $1891.02, which had been sold by the Siegels to the Simmons Company after May 10, 1897. If, on October 10, 1897, defendants in error owed the Simmons Company $4361.05 for "old goods," or $7387.13 for "new goods," or $11,748.18 for both "new" and "old goods," why was not the amount deducted from the amount of indebtedness embraced in the chattel mortgages? The chattel mortgages were given to secure not only rent and borrowed money, but $1891.02 for merchandise sold and delivered by defendants in error to the Simmons Company after May 10, 1897. The fact, that the Simmons Company owed this $1891.02 to the defendants in error for merchandise on October 10, 1897, shows that the defendants in error did not then owe the Simmons Company anything for merchandise undelivered; otherwise an offset would have been made, and the chattel mortgages would not have been executed for the amount therein specified. Upon this subject the Appellate Court in their opinion well say: "He (H. P. Simmons,) testified that the goods in question were not delivered. It seems almost incredible that, if this testimony is true, he would not have insisted that the Simmons Company should be credited with the amount of these goods before giving the mortgages. No other reasonable explanation can be made of the failure to include this alleged liability in the settlement, which resulted in the giving of these mortgages, under the evidence in this record, than that no such liability then existed. If such a liability existed, why was not the amount of $1891.02 for merchandise purchased after May 10, 1897, included in these mortgages, set off as against this alleged claim? To us, the whole evidence considered, the

only explanation of the giving of these notes and mortgages, without a mention of this alleged claim, is that the Siegels were not indebted to the Simmons Company to any amount after May 10, 1897."

It is said that the Simmons Company was insolvent on May 10, 1897, and had no right to release F. Siegel & Bros. from their obligation to pay an indebtedness then existing to the Simmons Company. The evidence does not establish the fact that on May 10, 1897, when the release was executed, the Simmons Company was insolvent. On the contrary, the Siegels agreed to advance them money until the fall of 1897, when, as W. A. Simmons stated, he would be able to obtain in Europe an additional capital of $100,000.00 to invest in his business. Business men, like the Siegels, would not have agreed to advance to the Simmons Company money for a period of upwards of six months after May 10, 1897, if they had believed that that company was insolvent on May 10, 1897. Moreover, we find no evidence in the record that the claims of these creditors, whose judgments were obtained long after the settlement of May 10, 1897, were in existence on May 10, 1897. Where a conveyance is alleged to be made in fraud of the rights of creditors, the creditors injured are those whose claims exist at the time of the conveyance. Only creditors, having claims when the fraud is committed, can avoid such conveyances. In *Mixell* v. *Lutz,* 34 Ill. 382, it was said (p. 387) : "If the conveyance was made before the indebtedness was incurred, then there was no fraud, as there was no design to hinder or delay creditors at the time; and the credit was not given upon the supposition that this property could be rendered liable for its payment." In *Seaman* v. *Bisbee,* 163 Ill. 91, it was held that a husband having conveyed his property to his wife without consideration, the conveyance could not be attacked by creditors, whose debts did not exist at the time of the voluntary conveyance. (See also *Wooldridge* v. *Gage,* 68 Ill. 157; *Moritz* v. *Hoffman,* 35 id. 553; *Tunison* v. *Chamblin,* 88 id. 378). It is not suf-

ficient that other creditors are prejudiced by such a conveyance or release, but it must be shown that the creditors, attacking the fairness of the transaction, had existing claims. There is nothing in the evidence in this record, so far as we have been able to find, which shows when the indebtedness of the Simmons Company to the present plaintiffs in error first came into existence. Moreover, according to the testimony of W. A. Simmons as above referred to, there was a good and valid consideration for the release of May 10, 1897, and it cannot be regarded as a mere voluntary release, executed without consideration. But these views are expressed upon the supposition that the testimony of W. A. Simmons is a correct statement of the terms of the settlement of May 10, 1897, or May 9, 1897. According to the preponderance of the evidence, however, as we read it, the release of May 10, 1897, was executed, not because there was to be a delivery of part of the goods, which defendants in error had agreed to deliver, but because there had been a delivery of all the goods under both contracts, which the defendants in error had agreed to deliver. In other words, the delivery of the goods, amounting to between $10,000.00 and $12,000.00, made in May, 1897, was in discharge of the two balances due upon both contracts, amounting to $11,748.18. This being so, there was no release of the indebtedness of the defendants in error to the amount of $7387.13 upon the fulfillment of certain conditions, but there was a discharge of a full indebtedness of $11,748.18 by the actual delivery of goods to that amount.

Counsel for the plaintiffs in error says that, if goods had been delivered in discharge of this indebtedness, entries to that effect would have been made upon the books of the Simmons Company. It appears that no such entries were made. Joseph Siegel testifies that, as both of the merchandise contracts had been settled, the Siegels did not consider it necessary to charge the job lot of goods delivered in May, 1897, against the Simmons Company, but that the matter was al-

lowed to stand open to be charged directly to The Grand when its affairs should be all settled. His testimony is to the effect that, when both contracts were closed by the delivery of one lot of merchandise and by an agreement that this should cover all merchandise then due under both contracts, F. Siegel & Bros. did not deem it necessary to charge the Simmons Company's account. The written memorandum, executed on May 10, 1897, was sufficient evidence of a settlement of the matter without any entries upon the books, although it would have been well to have made such entries in addition to the acceptance of the release. We agree with what the Appellate Court say upon this subject in their opinion delivered upon the decision of this case, where they use the following language: "Much stress is laid by appellees' counsel upon the fact, which appears from the evidence, that no entry of the delivery of these goods was made upon the books of Siegel & Bros. We have fully considered the fact, which is not without importance, but think it cannot overcome the other, and to us convincing evidence to which we have referred, and the further facts that no charge of fraud whatever is made in the pleadings against the Siegels, and they were merely closing up the affairs of The Grand, a corporation that was going out of business, and which they controlled."

Upon a careful examination of all the evidence in the record, we are satisfied that the defendants in error were not indebted to the Simmons Company, as charged by the plaintiffs in error.

Accordingly, the judgment of the Appellate Court, reversing the circuit court and affirming the findings of the master, is affirmed.                    *Judgment affirmed.*