In re Richard McDOWELL, Debtor.

Gibson D. KARNES, Trustee, Plaintiff,

v.

E. Jeanette McDOWELL, Defendant.

**Bankruptcy No. BK 86–40727.
Adv. No. 87–0115.**

United States Bankruptcy Court,
S.D. Illinois.

May 31, 1988.

Terry Sharp, Mt. Vernon, Ill., for plaintiff-trustee.

David T. Lumerman, Belleville, Ill., for defendant.

## MEMORANDUM AND ORDER

KENNETH J. MEYERS, Bankruptcy Judge.

This matter is before the Court on a complaint filed by plaintiff, Trustee of the Estate of Richard McDowell (debtor), seeking to avoid under 11 U.S.C. § 544(b) transfers of certain property by debtor to his wife, E. Jeanette McDowell (defendant), and to recover such property from defendant for the benefit of debtor's estate. By his complaint plaintiff alleges that debtor's transfers of property to defendant were fraudulent and should be set aside pursuant to Illinois fraudulent conveyances law. *See*, Ill.Rev.Stat., ch. 59, par. 4.

Plaintiff's complaint contains three counts alleging that debtor transferred assets to defendant, his wife, in fraud of creditors. Count I concerns the transfer of a retail grocery store from joint ownership by debtor and his wife to the sole ownership of defendant. It is admitted that the transfer occurred on October 29, 1984, and that no consideration was given for debtor's transfer of his one-half joint interest to defendant.

Count II is directed toward the transfer of certain oil properties from debtor's oil company to debtor and his wife in joint tenancy and to defendant individually. With regard to the first set of oil properties transferred from 1982 to 1984, defendant admits that she gave no consideration and that, in November 1986, she caused the joint tenancy to be severed by an assignment of her one-half interest to herself individually. The latter oil properties were transferred from debtor's oil company to defendant individually in 1985, and defendant alleges that she gave adequate consideration.

Count III alleges that in October 1984, defendant purchased a lot and subsequently constructed a house on the lot with profits from the oil interests previously transferred to defendant. It is conceded that plaintiff's allegations of fraud with respect to the house and lot are dependent on the findings made on Count II.

Evidence adduced through stipulation and testimony of the parties shows that debtor and his brother went into the oil business in 1981 and began selling working interests in various oil wells drilled by them to finance the production costs of the wells. Debtor's first well was drilled in early 1982, and he first obtained money from investors for the sale of working interests at that time. Debtor and his brother generally kept a one-quarter working interest in each well sold from 1982 to 1984, and debtor's one-eighth interest was issued to debtor and his wife in joint tenancy. It is undisputed that debtor sold interests in Illinois and other states without registering or seeking exemption from registration under applicable securities laws.

On October 22, 1984, debtor and his brother received an inquiry from the Illinois Securities Department (Department) regarding their failure to register or seek exemption from registration as required by Illinois law for oil interests sold to Illinois investors. On March 11, 1985, debtor and his brother entered into a "rescission agreement" with the Department by which all Illinois investors were to be given notice of their right to rescind their purchases of oil interests and those electing rescission were to be reimbursed as required by statute. Debtor and his brother subsequently paid all Illinois investors who elected rescission with the exception of two investors whose claims were disputed.

Sometime in 1985 debtor received notice that investors in Wisconsin and other states were considering action with regard to their purchases of oil interests. In Au-

gust 1985, the first suit by investors seeking rescission and damages for debtor's alleged violations of securities law was filed in Wisconsin. Subsequently, other lawsuits were filed by investors in Wisconsin and Florida. The plaintiffs in these lawsuits are listed in debtor's bankruptcy petition as unsecured creditors with contingent or unliquidated claims against debtor.

Following receipt of the Department's letter on October 22, 1984, debtor and his wife transferred the grocery store property to defendant individually on October 29, 1984. While debtor and his brother continued to drill oil wells after October 1984, debtor took no more oil interests in his name. Oil interests of investors who elected rescission after October 1984 were repurchased in debtor's or his company's name and no interests were repurchased in his wife's name.

In October 1984, defendant opened a bank account in her name individually and subsequently made payments totalling over $99,000 from this account to repurchase oil interests in Illinois and Wisconsin. These payments were made by a series of four checks from February 1985 to July 1986. In exchange for these payments made to and on behalf of the oil company, defendant acquired an interest in six new oil wells drilled by the company in 1985. Defendant testified that she did not pay for these interests directly but that they were an "accumulated thing." The six oil interests were acquired by defendant in her name alone in late 1985.

In the summer of 1986, debtor pledged his one-half joint interest in the oil properties owned with his wife to a law firm in Chicago to secure his debt for legal services performed by the firm with regard to the securities litigation against him. In November 1986, upon suggestion of the Chicago law firm, defendant assigned her one-half joint interest in the oil properties to herself individually in order to sever the joint tenancy between her and her husband. Subsequently, on December 23, 1986, debtor filed his individual bankruptcy petition for Chapter 7 relief.

All but two of the over 300 creditors listed in debtor's bankruptcy petition were investors in oil wells drilled by debtor and his brother from 1982 to 1984. Debtor testified at trial that when he and his brother first began drilling, their success rate was high, with "13 straight producers." The first well drilled by them, known as the Knackmus # 1, repaid investors the full amount of their investment in two years and is still producing. Some of these original investors, whose assignments of working interests were recorded on October 12, 1982, invested in later wells drilled by debtor's company and are listed in debtor's bankruptcy petition as creditors who have sought rescission of their purchases of oil interests.

Debtor testified further that during the years 1982 to 1985, he was solvent and had no debt. During this period, the value of jointly-held assets of debtor and his wife increased from $1.1 million in December 1982 to $2.5 million in December 1985. In 1984 and 1985, debtor paid over $989,808.00 to Illinois investors seeking rescission. In 1986, as a result of the securities lawsuits filed against him and the declining value of oil, debtor's financial condition was "nil," and he was forced to file for bankruptcy relief. Debtor's bankruptcy petition shows total claims against him for violation of securities laws at $16.5 million, including actual and punitive damages.

Defendant testified at trial that she had not been directly involved in the oil business during the years in which she acquired her oil interests but had worked full time at the grocery store since 1981 and had drawn no salary during that time. In 1984, defendant's son had suggested that the grocery store be put in her name alone so that she could "enhance her social security" and acquire an estate of her own. Prior to October 1984, defendant had had no separate estate and she and her husband had owned everything in joint tenancy. Defendant testified that she had paid $150,000 for the couple's house, built in late 1984, out of income from the oil interests acquired by her prior to that time.

In seeking to avoid debtor's transfers of his interest in the grocery store and of the oil interests conveyed to defendant in joint tenancy as well as individually, the trustee contends that the transfers were void under Illinois fraudulent conveyances law, which renders void transfers made with the intent to delay, hinder or defraud creditors. The Illinois statute on fraudulent conveyances provides in pertinent part:

Every gift, grant, conveyance, assignment or transfer of ... any estate ... made with the intent to disturb, delay, hinder or defraud creditors or other persons ... shall be void as against such creditors, purchasers and other persons.

Ill.Rev.Stat., ch. 59, par. 4.

Illinois courts have divided. fraudulent conveyances cases into two categories: fraud in fact and fraud in law. The proof requirements for these categories differ so that a plaintiff seeking to set aside a transfer on grounds of fraud in fact must demonstrate an actual intent to hinder creditors, while in fraud in law cases, fraudulent intent is presumed from the circumstances where there has been a voluntary transfer for no consideration which directly impairs the rights of creditors. *Indiana National Bank v. Gamble*, 612 F.Supp. 1272 (N.D.Ill. 1984); *Tcherepnin v. Franz*, 457 F.Supp. 832 (N.D.Ill.1978); *First Security Bank of Glendale Heights v. Bawoll*, 120 Ill.App.3d 787, 458 N.E.2d 193 (1983). The distinction between the two lies in whether the transfer was supported by consideration, and if there was no consideration and the transaction directly impaired or tended to injure rights of creditors, the transfer is considered fraudulent in law irrespective of the honesty of the grantor's motives. *Reagan v. Baird*, 140 Ill.App.3d 58, 94 Ill.Dec. 151, 487 N.E.2d 1028 (1985).

To sustain a claim of fraud in law, a creditor must prove three elements: (1) a voluntary gift, (2) an existing or contemplated indebtedness, and (3) failure of the debtor to retain sufficient assets to pay the indebtedness. *Indiana National Bank v. Gamble; Tcherepnin v. Franz*. As used in the statute, the term "creditor" refers only to creditors having existing claims at the time the alleged fraudulent conveyance is made. Thus,

[i]t is not sufficient that other creditors are prejudiced by such a conveyance ... but it must be shown that the creditors attacking the fairness of the transaction had existing claims. *Menconi v. Davison*, 80 Ill.App.2d 1, 4, 225 N.E.2d 139, 141 (1967) (quoting *Chicago Daily News v. Siegel*, 212 Ill. 617, 629, 72 N.E.2d 810, 814 (1904)).

The term "creditor" has received a liberal construction under the statute, and the subsisting claims need not have matured or have been reduced to judgment at the time the conveyance is made but may be contingent upon some further happening to render them due. *Menconi v. Davison*.

With regard to the grocery store and the oil interests conveyed to defendant in joint tenancy prior to 1985, the trustee contends that these transfers constituted fraud in law because no consideration was given and the transfers were made at a time when debtor had existing creditors as a result of his violations of securities laws. It is the trustee's position that debtor's sale of working interests to investors without registration or exemption from registration created an automatic right of rescission in each investor, by which investors could obtain a refund of their purchase price plus interest and attorney's fees, and debtor thus became indebted to such investors upon each sale beginning in 1982 when he first sold working interests to finance the drilling of oil wells. The trustee maintains that since each investor became a creditor at the time of sale, debtor's corresponding transfer of oil interests to himself and his wife in joint tenancy had the effect of placing one-half of his property beyond the reach of such creditors who had claims against him.

Likewise, the trustee asserts, the transfer of the grocery store from joint tenancy to defendant individually in October 1984 effectively removed debtor's one-half interest in the store beyond the reach of creditors existing at that time. The trustee contends, therefore, that the facts sufficiently establish the second element neces-

sary to prove fraud in law, and that, since debtor's subsequent bankruptcy as a result of investors' lawsuits against him established the third element of failure to retain sufficient assets to pay the indebtedness, he is entitled to judgment against debtor as to the transfers of the grocery store and the pre–1985 oil interests on the grounds of fraud in law.

As noted, the trustee has brought this action to avoid debtor's transfers of property to defendant under § 544(b) of the Bankruptcy Code. Section 544(b) provides in pertinent part:

> The trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title....

Section 544(b) presents a method of avoidance that is predicated upon nonbankruptcy law, in this case state law, governing the transaction in question. 4 *Collier on Bankruptcy*, § 544.03[1], at 544–16. Section 544(b), however, does not create in the trustee any independent right or power with which to challenge an allegedly invalid transfer, and the trustee's ability to proceed depends upon the existence of at least one creditor with a right of avoidance against the debtor. *Id.* Since the trustee is compelled to stand on the rights of at least one qualified creditor, § 544(b) confers upon the trustee no greater rights of avoidance than the creditor himself would have if he were asserting invalidity on his own behalf. *Id.* § 544.03[2], at 544–21. Consequently, if the creditor is barred from recovery because of the running of a statute of limitations prior to the commencement of the case, the trustee is likewise rendered impotent. *Id.*

■ In the instant case, in order to bring this action under § 544(b), the trustee must establish the existence of a creditor with a viable cause of action against debtor that is not time-barred or otherwise invalid. In addition, in order to succeed in his action to avoid debtor's transfers under Illinois fraudulent conveyances law, the trustee must show that there were creditors exist-

ing at the time debtor made the transfers of oil interests in joint tenancy as well as the transfer of his joint interest in the grocery store. Thus, the trustee's action against defendant depends upon whether there was a creditor existing at the time the transfers were made that still had a viable claim against debtor at the time the bankruptcy petition was filed.

As noted above, the trustee asserts that each investor who purchased a working interest in oil wells drilled by debtor and his brother became a creditor at the time of sale because of debtor's failure to comply with the registration requirements of applicable securities laws. The trustee's position thus requires an analysis of debtor's liability under applicable securities laws to determine whether such investors constituted creditors that were capable of voiding debtor's transfers of property under Illinois fraudulent conveyances law.

Because many of the oil interests sold by debtor were sold to Illinois investors, debtor was required by the Illinois Securities Law of 1953 (*see* Ill.Rev.Stat., ch. 121½, par. 137.1 *et seq.*) to register or seek exemption from registration for such interests, which constitute securities for purposes of the statute. *See McConnell v. Surak*, 774 F.2d 746 (7th Cir.1985). Debtor's failure to comply with the statutory requirements gave each investor the right to rescind his purchase within three years from the date of sale. *See* Ill.Rev.Stat., ch. 121½, par. 137.13; *McConnell v. Surak*. In addition, because debtor sold interests to investors in other states, including the state of Wisconsin, debtor was required to comply with the state securities laws of those states (commonly referred to as "blue sky laws"), as well as federal securities laws governing the interstate sale of securities. *See* 1 Private Placements in Oil under SEC Regulation D 39–41, 171–177 (L. Mosburg, Jr. ed. 1982); *see generally* L. Loss, Fundamentals of Securities Regulation 1012–1017 (1983) (hereinafter Loss, Securities Regulation).

The trustee concedes that Illinois investors whose interests were rescinded pursuant to debtor's agreement with the Illinois

Securities Department are no longer "creditors" whose claims can be pursued by the trustee under § 544(b). The trustee observes, however, that some 35 out-of-state investors whose assignments of oil interests were recorded on October 12, 1982, are listed on debtor's bankruptcy petition as creditors of debtor. The trustee asserts that these investors had a claim against debtor from the time he and his brother began selling oil interests in 1982 and that, since they have not had their purchases of oil interests rescinded, they constitute "creditors" with existing claims for purposes of setting aside debtor's transfers of property under Illinois fraudulent conveyances law. In particular, the trustee cites the names of James and Shirley Greenwald as an example of such creditors. Debtor testified at trial that the Greenwalds, who are residents of Wisconsin, purchased an interest in the Knackmus #1 well drilled by his company in early 1982. Debtor further acknowledged that the Greenwalds were plaintiffs in a lawsuit pending against him in Iowa County, Wisconsin and, as such, were listed as creditors in his bankruptcy petition.

The trustee has argued the question of debtor's liability to out-of-state investors such as the Greenwalds in terms of debtor's violation of Illinois securities law. However, the exemption from registration and report of sale requirements of the Illinois statute apply only to sales to investors in this state (*see* Ill.Rev.Stat., 1981, ch. 121½, pars. 137.4.G, 137.4.H (amended 1984)), and "there is no right of action under the [Illinois securities] statute unless the sale complained of took place in Illinois." *Kramer v. Pittstown Point Landings, Ltd.*, 637 F.Supp. 201, 205 (1986) (quoting *McBreen v. Iceco, Inc.*, 12 Ill. App.2d 372, 377, 139 N.E.2d 845, 858 (1956)). This Court may nevertheless take judicial notice of the laws of other states and will, accordingly, consider the liability of debtor with reference to the requirements of Wisconsin securities law applicable to this case.

The Wisconsin securities statute (*see* Wis.Stat. § 551.01 *et seq.*) differs from the Illinois statute in that Wisconsin has

adopted a form of the Uniform Securities Act (*see* 7B U.L.A. 515–687 (1985)). Like the Illinois statute, however, the Wisconsin statute contains a provision imposing civil liability for failure to register or seek exemption from registration for securities sold in that state. Section 551.59 of the Wisconsin Uniform Securities Law provides in pertinent part:

(1)(a) Any person who offers or sells a security in violation of s. 551.21 [requiring registration or exemption from registration for any security sold in the state] ... shall be liable to the person purchasing the security from him or her. The person purchasing the security may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate ... from the date of payment, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security.... Tender shall require only notice of willingness to exchange the security for the amount specified....

(5) No action shall be maintained under this section unless commenced before the expiration of 3 years after the act or transaction constituting the violation....

The civil liability provision of the Uniform Securities Act, adopted by the Wisconsin legislature as § 551.59(1)(a), is closely modeled on § 12(1) of the Federal Securities Act of 1933 (15 U.S.C. § 77*l*), which likewise imposes civil liability on one who offers or sells nonexempt securities in violation of specified registration requirements. *See* Loss, Securities Regulation 1013 (1983). Under § 12(1) and, by analogy, § 551.59(1)(a), liability for the sale of unregistered and nonexempt securities is absolute. *Id.* at 1017; *see Swenson v. Engelstad*, 626 F.2d 421 (5th Cir.1980); Sachnoff & Susman, Civil Liabilities, in 2 Securities Law 16–20 (Ill.Inst. for CLE 1979). The seller's intent and his knowledge of the violation are entirely irrelevant to a determination of liability, and a dissatisfied investor need only tender his security as provided by statute in order to recover his purchase price. Loss, Securities Regula-

**560**

tion 1018. When there have been separate transactions, the investor may choose to rescind only those that have been unprofitable, as those transactions for which no rescission has been sought remain unaffected. *See id.*

As provided in § 551.59(5), an action to rescind must be brought within three years of the date of sale of the security or be barred by the statute of limitations. If no such action is brought, the purchaser's ability to avoid the sale lapses, and the seller has no liability to the purchaser under the statute.

■ In seeking to determine when debtor became indebted to investors for purposes of the trustee's suit to avoid transfers made in fraud of creditors, it is necessary to consider whether and when such investors brought suit to rescind their purchases of oil interests. While the trustee contends that debtor became indebted to investors when he first sold oil interests without registering or seeking exemption from registration under applicable securities laws, such sales merely created a right in the investors to rescind their purchases within the statutory time period. The investors' potential claims against debtor did not mature until such time as they elected to rescind their purchases and took the affirmative step of filing suit against debtor. Since, absent such an election, the investors did not become "creditors" of debtor for purposes of Illinois fraudulent conveyances law, this Court must consider the evidence and exhibits filed with the Court to determine when debtor's liability arose.

Debtor testified at trial that the first well drilled by him and his brother in early 1982, the Chester Knackmus #1, repaid investors the full amount of their investment plus a profit. There is no proof in the record that any investor who purchased a working interest in the Chester Knackmus #1 well ever sought rescission with regard to their interests in this well. Although, as the trustee observes, the Greenwalds purchased an interest in this initial well drilled by debtor, it does not follow that they became "creditors" of debtor from the date

of their purchase since they never sought rescission of their interest in this well. Rather, it appears that the Greenwalds' status as creditors in debtor's bankruptcy petition derived from their purchase of interests in later oil wells drilled by debtor for which they subsequently sought rescission. Thus, the trustee has failed to sustain his claim that the Greenwalds constituted creditors from the time debtor drilled his first oil well in early 1982. In addition, since the statute of limitations for bringing a rescission action as to interests purchased in this well has run, debtor no longer has exposure to liability by reason of his failure to register or seek exemption from registration for interests sold in this well. The trustee has failed to show the existence of at least one creditor on whose rights he could stand in avoiding debtor's transfers of oil interests to defendant in early 1982, and the trustee cannot avoid transfers made at that time pursuant to his powers under § 544(b).

■ While it has not been shown that debtor had creditors when he first began drilling oil wells and making transfers of interests in these wells to defendant, debtor subsequently became liable to investors who elected to rescind their purchases of oil interests because of debtor's failure to register or seek exemption from registration under applicable securities law. The investors' claims for rescission were filed under federal and state securities laws, including § 551.59(1)(a) of the Wisconsin Uniform Securities Law. By the terms of § 551.59(1)(a), debtor's liability to investors who had fulfilled the condition precedent of bringing suit and thereby tendering their securities was absolute and dated from the time of their purchase of securities for which rescission was sought. Thus, even though the first securities lawsuit was not filed until August 1985, debtor's liability to such investors arose as of the date their interests were purchased, and they could be said to be "creditors" as of that date for purposes of Illinois fraudulent conveyances law. *Cf. Menconi v. Davison*: plaintiff, who was entitled to brokerage commission by reason of executed sales contract at

time allegedly fraudulent conveyance was made, was "pre-existing creditor" with subsisting claim under fraudulent conveyances law even though plaintiff's claim had not become fixed until after such conveyance.

At trial the trustee introduced into evidence a complaint from one of the securities lawsuits pending against debtor in Iowa County, Wisconsin. In addition, complaints from three other such lawsuits were appended to the proofs of claim filed in the bankruptcy proceeding, and this Court may take judicial notice of these complaints as records of this Court. While these complaints contain multiple causes of action under different securities law provisions, this Court has examined the complaints with regard to the counts for rescission under § 551.59(1)(a) based upon debtor's failure to register or seek exemption from registration for oil interests sold in Wisconsin. The Court's examination reveals that the earliest such claims for rescission in the complaints before the Court were for oil interests purchased on May 23, 1983, in an oil well known as the Dean Wiseman # 1. As discussed above, once investors elected to rescind their purchases of oil interests by filing suit against debtor, debtor's liability became established as of the date the interests were purchased. This Court finds, therefore, that the investors seeking rescission for interests purchased on May 23, 1983, constituted creditors of debtor as of that date for purposes of Illinois fraudulent conveyances law.

■ The third element of fraud in law, failure to retain sufficient assets to pay the indebtedness existing at the time of transfer, is sufficiently established by debtor's bankruptcy petition in which investors who made claims dating from May 23, 1983, were listed as creditors who remained unpaid by debtor. Under Illinois law,

> [i]t is of no moment that the property remaining in the grantor's hands after the [allegedly fraudulent] conveyance was in nominal value more than equal to the amount of his indebtedness if subsequent events show that the property retained was not sufficient to discharge all his liabilities. *Cairo Lumber Co., Inc. v.*

*Ladenberger*, 313 Ill.App. 1, 6, 39 N.E.2d 596, 598 (1941), quoting *Birney v. Solomon*, 348 Ill. 410, 414, 181 N.E. 318, 320 (1932); *see also Tcherepnin v. Franz.* Thus, while debtor asserts that his transfers of property to his wife were not in fraud of creditors because he was solvent and had substantial net worth from 1981 through 1985, proof of actual insolvency at the time of conveyance is not necessary to render a voluntary conveyance void, especially where, as here, the conveyance was between family members. *See Cairo Lumber Co., Inc. v. Ladenberger.*

Since the same investors who had claims against debtor as a result of his violation of securities law remained unpaid as of the time of his bankruptcy petition, they were capable of avoiding any gratuitous transfers of oil interests made by debtor to his wife beginning on May 23, 1983. This Court finds, therefore, that debtor's transfers to defendant of oil interests from May 23, 1983 through 1984 and debtor's transfer of his one-half joint interest in the grocery store on October 29, 1984, were fraudulent in law and may be set aside by the trustee acting on behalf of these creditors pursuant to § 544(b).

■ With regard to the six oil interests transferred to defendant in late 1985, defendant contends that she paid adequate consideration for these interests and that the trustee thus must show actual intent to defraud creditors before these transfers could be set aside as fraudulent in fact. It is unclear from the evidence whether defendant's payments made to and on behalf of debtor's oil company from February 1985 to July 1986 constituted actual consideration for the six oil interests transferred to her in late 1985. Defendant herself testified that she did not pay for the wells directly but that they were an "accumulated thing," and no evidence was presented showing the value of the wells or to what extent the wells were transferred in payment for "loans" made by defendant to the company.

Assuming, however, that defendant gave consideration for the oil interests in question, there was sufficient evidence that

debtor transferred these interests with the intent to hinder, delay, or defraud creditors to support a finding of fraud in fact. Debtor's testimony indicates that after receiving the letter from the Illinois Securities Department in October 1984 regarding his potential liability for violations of securities law, he changed his past practice and took no more interests in new wells drilled by the company in his own name. Prior to that time all interests in the company's wells had been acquired in his and his wife's names in joint tenancy. While debtor did repurchase interests that he was forced to reacquire by reason of investors' rescissions in his own name, the six interests in the more productive and hence more valuable new wells drilled in 1985 were transferred to his wife alone.

Debtor's transfer of the six oil interests to his wife in 1985 was consistent with his attempt to put other property in his wife's name individually after he became aware of his potential liability to investors following receipt of the October 22 letter. Defendant testified that prior to that time, she and her husband had owned everything in joint tenancy. However, following debtor's receipt of the letter from the Department, defendant opened a separate checking account, from which she made the payments to repurchase rescinded oil interests on the company's behalf. Additionally, debtor transferred his interest in the grocery store property to defendant in order, as she testified, to create a separate estate for his wife individually. While this endeavor to create an estate for his wife would have been proper in the absence of creditors who would be hindered by the transfer of property from debtor's estate, the evidence sufficiently establishes that the transfers to defendant, including the transfer of six oil interests in 1985, were made with the intent to remove property from his own estate which would be subject to the claims of existing creditors. The transfer of the six oil interests in 1985 thus constituted fraud in fact and can be avoided by the trustee acting on behalf of creditors under § 544(b).

As noted previously, the trustee's argument with regard to the final items of property allegedly transferred to defendant in fraud of creditors, the house and lot acquired with profits from oil interests owned by defendant prior to October 1984, is dependent on whether the oil interests themselves were transferred to defendant in fraud of creditors. The trustee has argued that all oil interests transferred to defendant from early 1982 when debtor started selling oil interests were in fraud of creditors. It is his position, therefore, that any assets purchased by defendant with profits from these oil interests constituted "fruits of the poison tree" and must likewise be brought back into debtor's bankruptcy estate.

This Court has found that only those oil interests transferred to defendant beginning on May 23, 1983, when debtor first had creditors which he failed to retain sufficient assets to repay were fraudulent and could be avoided by such creditors. The trustee has not shown that the house and lot were acquired with profits from oil interests transferred to defendant after May 23, 1983, and this Court, accordingly, finds no basis for the trustee's argument that the house and lot constitute assets of debtor's estate.

For the reasons stated, this Court finds that debtor's transfer to defendant of his one-half joint interest in the grocery store property; debtor's transfer to defendant of oil interests from May 23, 1983 through October 1984; and debtor's transfer to defendant of oil interests in 1985 are void and should be returned to plaintiff as trustee of debtor's bankruptcy estate.

IT IS SO ORDERED.