MANDOLINI COMPANY, Plaintiff-Appellee, v. CHICAGO PRODUCE SUP-
PLIERS, INC., Defendant (S & M Produce Company *et al.*, Garnishees and
Defendants-Appellants).

First District (2nd Division)   No. 1—87—3228

Opinion filed June 6, 1989.

Berliner & Krasnow and Mark R. Ordower, both of Chicago (Henry C. Krasnow and Ross J. Peters, of counsel), for appellants.

Eric P. Ferleger, of Chicago, for appellee.

JUSTICE EGAN* delivered the opinion of the court:

The garnishee-defendant, S&M Produce Company (S&M), appeals from an order of the circuit court imposing a lien in the amount of $12,532.63 against S&M's beneficial interest in a land trust pursuant to the plaintiff's motion to set aside improper payments. The issue is whether a debtor transferred property to S&M in a manner that improperly defeated the rights of the plaintiff-creditor.

Before November 15, 1982, the defendant, Chicago Produce, Inc. (CPS), and S&M were owned and operated by the Mided family. Sam Mided and his sons Donald and Adam served as directors and officers of both corporations, which were engaged in the wholesale produce business. Another son, Lance, served as secretary of CPS. CPS and S&M were sister corporations as defined by the Internal Revenue Code because Sam, Donald and Adam held common ownership of the two corporations. 26 U.S.C. §1563 (1986).

Disagreements between Donald and Adam regarding the business operations of CPS led to the resignations of Donald and Sam from their respective positions with CPS on November 15, 1982. Additionally, they sold their shares in CPS stock to Adam, the chief executive officer. Adam Mided severed his association with S&M by resigning from his positions of director and officer of that corporation. He also sold his shares of S&M stock to Donald and Sam. Hence, the two companies ceased to be sister corporations as of that date because Adam Mided became the sole director, officer and shareholder of CPS. CPS owed S&M $240,928 primarily for loans beginning in May of 1979 and continuing through July of 1981, as well as some goods advanced on credit.

The accountant serving both corporations at the time of change in structure, Ruben Vernof, testified that discussions had been ongoing during this period as to how CPS would satisfy the debt. On December 6, 1982, CPS assigned its beneficial interest in two pieces of real

---

*Justice Egan participated in the decision of this case prior to his assignment to the sixth division.

estate, 1615 S. Peoria and 96 South Water Market, from which it operated its business, to S&M in partial satisfaction of its debt. S&M credited CPS with $227,646 against its debt of $240,928 on the corporate books. A debt of about $10,000 remained after the transaction was completed. In addition to the conveyance, CPS entered into a lease agreement with S&M on the same day to rent its prior office space at 96 South Water Market Street for a monthly rate of $656.

From the time of the conveyance on December 6, 1982, until July 1983 when CPS ceased operations, S&M sold it about $120,000 in goods/produce. At the time CPS notified all its creditors that it was discontinuing its operations and stretching out its payments, it owed S&M about $56,000. The plaintiff, Mandolini Company, filed an action against CPS to recover its outstanding indebtedness of $12,352.63 on September 27, 1983. The complaint alleged that the outstanding balanced owed by CPS was "exhibited" by an invoice attached to the complaint. That invoice reflects purchases made between May 12, 1983, and August 24, 1983, and a balance brought forward of $6,966.39. (The property in issue was conveyed from CPS to S&M on December 6, 1982.) The trial court entered an *ex parte* default judgment against CPS in the amount of $12,352.63 plus costs on July 24, 1984, for failing to answer the plaintiff's complaint.

Pursuant to the plaintiff's citation to discover assets served on Donald Mided, it learned of the history behind the interlocking directorship between CPS and S&M before November 15, 1982, the substantial loans from S&M to CPS from 1979 to 1981 and that CPS had conveyed its only two tangible assets to S&M on December 6, 1982. The plaintiff subsequently filed a motion to set aside the improper payments and for a turnover order against S&M. It asserted that S&M, Donald Mided and the other corporate shareholders "received an advantage of preference in the payment of their claims" at the expense of the plaintiff and CPS' other creditors. At the hearing on the motion the plaintiff did not introduce any evidence as to the fair market value of the realty at the time CPS conveyed its beneficial interest to S&M. S&M maintained that the consideration exchanged for the realty was certain advances and the $227,646 written off for loans, totalling $240,928.

Relying on the testimony, the financial statements and tax returns of CPS from 1979-82 and S&M from 1979-83, the judge found that CPS was insolvent during the years 1979 through 1982 and would have been unable to carry on its business but for the fact that S&M had not called for the repayment of its loans. He held that the directors of S&M, Donald Mided and Sam Mided, could not receive the

preference over CPS' other creditors resulting from CPS' conveyance of its beneficial interest to S&M, because they were aware through their prior fiduciary relationship with CPS that it was insolvent at the time of the transaction. Relying on the case of *Blocker v. Drain Line Sewer & Water Co.* (1972), 5 Ill. App. 3d 289, 282 N.E.2d 207, he held that the directors of CPS had a fiduciary obligation to *creditors* of the corporation to notify them of the insolvency. S&M has attacked the theory upon which the court based its holding; and the plaintiff does not attempt to support it. In oral argument before us, the plaintiff's attorney made it clear that he did not agree with the trial court's reasoning, but that the trial court came to the right conclusion although for the wrong reason.

S&M raises a number of arguments in support of its contention that the order must be reversed. We believe that we need address only one of them: that the plaintiff failed to prove that it was a creditor of CPS at the time of the conveyance of the property from CPS to S&M.

■ The general law in Illinois is that only those creditors who had existing claims at the time of the transfer may complain that the transfer of property was made in derogation of their rights; and the burden is on the creditor to establish the existence of a preexisting debt. In *Chicago Daily News Co. v. Siegel* (1904), 212 Ill. 617, 629-30, 72 N.E. 810, the supreme court held as follows:

> "Where a conveyance is alleged to be made in fraud of the rights of creditors, the creditors injured are those whose claims exist at the time of the conveyance. Only creditors, having claims when the fraud is committed, can avoid such conveyances. In *Mixell v. Lutz*, 34 Ill. 382, it was said (p. 387): 'If the conveyance was made before the indebtedness was incurred, then there was no fraud, as there was no design to hinder or delay creditors at the time; and the credit was not given upon the supposition that this property could be rendered liable for its payment.' In *Seaman v. Bisbee*, 163 Ill. 99, it was held that a husband having conveyed his property to his wife without consideration, the conveyance could not be attacked by creditors, whose debts did not exist at the time of the voluntary conveyance. [Citations.] It is not sufficient that other creditors are prejudiced by such conveyance or release, but it must be shown that the creditors, attacking the fairness of the transaction, had existing claims."

See also *Menconi v. Davison* (1967), 80 Ill. App. 2d 1, 4-5, 225 N.E.2d 139, 141-42; 20 Ill. L. & Prac. *Fraudulent Conveyances* §203 (1956).

■ The plaintiff's first response to this argument is that we cannot pass on this question because S&M failed to raise it before the trial court in its response to the plaintiff's turnover motion. S&M did not attack the plaintiff's status in its response to the turnover motion; but there was no obligation that it do so. It was the duty of the plaintiff to prove the debtor-creditor relationship between CPS and itself at the time of the conveyance of the property. It was not an affirmative defense, that is, it was not the duty of S&M to show that the plaintiff was not a creditor. The cases cited by the plaintiff are inapposite. In *Consoer, Townsend & Associates v. Addis* (1962), 37 Ill. App. 2d 105, 185 N.E.2d 97, the appellate court refused to consider an *affirmative defense* which the defendant was obliged to plead. In *Lien v. Pietruszewski* (1974), 24 Ill. App. 3d 784, 321 N.E.2d 442, *aff'd* (1975), 61 Ill. 2d 350, 335 N.E.2d 772, an objection was made in the appellate court that the plaintiff was an improper party plaintiff; and the appellate court said that the objection to the plaintiff's standing should have been made first by motion in the trial court. In *Mid-States Finance Co. v. Redman* (1969), 111 Ill. App. 2d 107, 248 N.E.2d 789, the appellant raised arguments in the appellate court that were not raised in the trial court. The appellate court said that it would be justified in refusing to consider such new arguments, but it did consider them anyway.

The plaintiff told us in oral argument that S&M raised this issue only when the judge was about to make his ruling. Our review of the record discloses to the contrary and shows that the court was apprised of S&M's position from the time of the opening statement in which S&M's attorney spoke, in part, as follows:

"If one takes a look at the attachments to the complaint, which were the ledger sheets which add up to the $12,000.00 figure that he is asking for here, *all of the transactions which are the basis of this $12,000.00 that is owed occurred in the year 1983, from May 1983 through July of 1983. The transactions that he is asking us to vacate occurred in December of 1982.*" (Emphasis added.)

"*But these losses to Mandolini Company didn't even take place until May '83, July '83, when they finally gave their billing in August '83 covering this entire amount.* And that was the same time that Mr. Mided's company, S&M Produce was giving a billing to this company in the amount of $56,000.00. So, Your Honor, once these facts are in I don't think we need to argue the details of the law any more." (Emphasis added.)

"Even in that case he is still saying that the debt that he in-

curred in this corporation didn't occur until at least six months after, or five months to six months, after this transaction the first ones that he seen ***. So that—so he is saying that he was not a creditor with respect to this suit at the time that this transaction took place. So what standing does he have even to—."

The record also shows the awareness of the plaintiff's attorney that S&M was questioning the plaintiff's standing when he said "that is what [S&M's attorney's] initial threshold is, that we transferred these before we incurred this debt and that makes it okay. I don't agree with that." Later he told the court that he would prove that the debtor-creditor relationship existed at the time of the conveyance:

"[S]o for the record and my opening statement let me further clarify *that at the time the transfers were made there were substantial amounts owing and due between the plaintiff* and the, let's just say third-party corporation, that received the benefit of the realty." (Emphasis added.)

■ We judge, therefore, that the question of the plaintiff's status as a preexisting creditor has been properly preserved for review.

In its brief, the plaintiff alternatively responds to this argument on the merits with the assertion that "the record is clear that the argument presented by the defendant has absolutely no foundation whatsoever." It also says "that the record is clear and uncontraverted . . . that money was due and owing to [the plaintiff] and others by CPS at the time of the above-mentioned conveyance." It refers to no part of the record to support those assertions.

During oral argument this court asked the plaintiff's attorney to indicate what part of the record supported a finding that it was a preexisting creditor. In response, the plaintiff's attorney referred us to the ledger sheets attached to the complaint filed against CPS. (Those sheets are of dubious admissibility against S&M.) They contain 102 entries and are dated beginning on May 18, 1983, and ending on August 24, 1983. The first sheet shows a balance forwarded of $6,966.38. Even assuming that the ledger sheets attached to the plaintiff's complaint against CPS could properly be considered as proof against S&M, there is no evidence provided by the sheets which indicates that the opening balance was composed of credit extended by the plaintiff on or before December 6, 1982. S&M's attorney raised the unreliability of the balance figure in his opening statement. It is inescapable that the plaintiff's attorney was aware that a serious question was being raised by S&M whether the plaintiff would be able to establish that CPS owed the plaintiff $12,352 or any other sum on

December 6, 1982. If, indeed, the plaintiff was a creditor in December 1982, we fail to understand why no representative of the plaintiff was called to establish that simple fact. We also think it puzzling that the plaintiff's motion did not expressly allege that a debtor-creditor relationship existed on December 6, 1982. Instead, it ambiguously recited that purchases were made by the plaintiff from CPS in 1981, 1982 and 1983; and pointedly said that the debtor-creditor relationship existed on the date of the filing of the complaint, September 27, 1983.

■ On June 3, 1987, the court entered an order which included a finding that the plaintiff was a creditor of CPS as a supplier during the period from 1980 until December 6, 1982. On June 16 that order was vacated, and on July 21, 1987, the court, significantly, amended the previous order and found that the plaintiff was a creditor of CPS as a supplier from 1980 until *November 15, 1982*. The plaintiff makes no issue of that finding. It is clear to us, therefore, that the plaintiff has failed to establish, and the court did not find, that it was a creditor of CPS at the time of the conveyance to S&M on December 6, 1982.

■ An exception to the general rule provides that a voluntary conveyance may be set aside at the instance of subsequent creditors upon proof of actual fraudulent intent. (20 Ill. L. & Prac. *Fraudulent Conveyances* §204 (1956); *Cramer v. Bode* (1887), 24 Ill. App. 219. See also *National City Bank v. Cowdin* (1931), 343 Ill. 430, 175 N.E.2d 411.) In this case there was no finding of actual fraudulent intent; and the evidence does not support such a finding.

For these reasons the judgment of the circuit court is reversed.

Judgment reversed.

BILANDIC, P.J., and HARTMAN, J., concur.