EDWARD GOLIN, Plaintiff-Appellee, v. JOHN RUKAVINA, Defendant-Appellant.

First District (6th Division)   No. 1—89—1361

Opinion filed February 1, 1991.—Rehearing denied March 14, 1991.

William E. Reynolds, of Chicago (Timothy Quinn, of counsel), for appellant.

Lisco & Field, of Chicago (Robert F. Lisco and Jill Kline, of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Edward Golin (Golin), was working on a building on Michigan Avenue in Chicago on October 10, 1982, when an altercation occurred between him and the defendant, John Rukavina (Rukavina), who was at the building site pursuant to his duties as a building inspector for the City of Chicago; he was also a part-time deputy sheriff for Cook County and was armed with a gun. The gun was discharged, and Golin was shot in the arm. Golin sued Rukavina, the City of Chicago and the County of Cook.

The complaint upon which trial began contained three counts: count I sought compensatory damages from Rukavina and the City of Chicago for negligence; count II sought compensatory damages from Rukavina and the County of Cook for negligence; and count III sought punitive damages from Rukavina only for willful and wanton conduct. At the close of the plaintiff's case, the judge directed a verdict in favor of Cook County on count II.

Rukavina moved for a directed verdict on count III, arguing that the evidence was insufficient to establish willful and wanton conduct on his part. The judge agreed that the evidence was insufficient and orally ruled that the verdict would be directed in Rukavina's favor on count III. The City then moved for a directed verdict on the ground that the evidence was insufficient to establish willful and wanton conduct as required under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (Ill. Rev. Stat. 1985, ch. 85, par. 1—101 et seq.). The judge noted that he had previously said that "there isn't enough evidence to support any contention that [the conduct is] willful and wanton." He added, however, that he was "rethinking" and that he would take the matter under advisement. He later changed his ruling and, over objection, permitted the plaintiff to file an amendment to counts I and III. Both counts, as

amended, alleged willful and wanton conduct on the part of Rukavina. Count I sought compensatory damages from Rukavina and the City of Chicago; count III sought punitive damages from Rukavina only.

A jury returned a verdict in favor of Golin and against Rukavina and awarded $150,000 in compensatory damages and $20,000 in punitive damages. The jury returned no verdict as to the City of Chicago.

Rukavina filed a post-trial motion for judgment *n.o.v.* or for a new trial. The judge granted Rukavina's motion for judgment *n.o.v.* as to count I only and denied his post-trial motion as to count III. Rukavina appeals from the order denying his post-trial motion as to count III, and Golin cross-appeals from the order granting judgment *n.o.v.* in favor of Rukavina on count I. Golin does not appeal the judgment in favor of the City of Chicago.

The threshold issue is whether the evidence establishes that Rukavina's conduct was willful and wanton, as required by the Tort Immunity Act. (Ill. Rev. Stat. 1985, ch. 85, par. 2–202.) Not uncommonly, the witnesses' versions differ. Consequently, a comparatively detailed recitation of the evidence is required.

On October 10, 1982, Golin was an elevator foreman working for Riverside Corporation on the construction of the One Magnificent Mile building in Chicago. The building was to be 60 stories high, and at the time of the occurrence about 38 or 40 stories of the building exterior had been completed. There were two temporary elevators on the building. The personnel elevator, which was used to haul the workmen up to the top, was located on the southwest corner of the building. The material hoist was located on the northwest corner. John Guzman was part of Golin's crew, which was working on the personnel elevator. Rich Harold was in charge on the top side of the elevator, and Golin was in charge on the lower end of the elevator. Owen Doherty was an ironworker also employed by Riverside; he was part of the crew that erected the elevator, and Golin was Doherty's immediate boss. There were two cranes on the building. Around 10 a.m., a hook fell off one of the cranes at the northeast corner of the building and hit the back of a CTA bus. Neither Golin nor any of his crew had anything to do with the hook accident.

Golin and Guzman testified that they went to lunch at a bar around 11:45 or 12 and returned to work before 1 p.m. Golin said that it was possible that he had three or four beers at lunch, but it was more likely that he had two or three beers. He was not drunk, and he had no trouble walking back to the jobsite, which was about 2½ blocks away. The following represents a summary of his testimony.

Around 3:45 p.m., Golin was working on the elevator cables in the "pit," about eight feet below ground. He and Guzman were preparing to get the elevator car into operation, while Doherty was outside the pit, going back and forth to his truck putting away tools. Five workers were on the 40th floor. Golin said that the elevator could have been running for emergency use within 20 minutes. He looked up and saw a man, later identified as Peter Vrdolyak, looking down into the pit. He did not know Vrdolyak, nor did he know that Vrdolyak was a city building inspector; Vrdolyak did not identify himself. He asked Vrdolyak if he could help him; Vrdolyak answered that he would let him know if he could help him, and walked away. Vrdolyak returned and demanded a ride up to the 38th floor. Golin told him that no one could go up for about 20 minutes. Golin came up from the pit and saw Rukavina standing with Vrdolyak. He did not recognize Rukavina, and Rukavina did not identify himself.

Vrdolyak followed Golin into the machine room on the first floor, and Golin told Harold by radio that Vrdolyak said that he was an inspector who said they would all go to jail if Golin touched the elevator button. Golin then operated the elevator and lowered the men who were in the elevator about five feet; Vrdolyak told him that he was going to jail. Vrdolyak then left with Rukavina. Golin came out of the machine room and was talking to the elevator operator when he was approached by Rukavina. Rukavina began using vulgar language in a very loud voice and then pushed Golin against some gates which were stacked against the wall. He never attempted to hit Rukavina before Rukavina pushed him.

After he was pushed into the gates, he got up and went to grab Rukavina. Rukavina threw two good punches at him, then Golin grabbed Rukavina by the shoulder and arm and got him in a wrestling hold. At least one of Rukavina's punches was to Golin's face. Golin then yelled to Guzman to get Rukavina off him. Guzman came out of the pit and tried to pull Rukavina off Golin, and then the gun went off.

Golin did know at first that what he heard had been a gun shot. The flash from the gun was right next to his eyes. His face was maybe three or four feet up off the ground. He never saw a weapon pulled or aimed. Rukavina was trying to hit him at the time. Golin was in a crouched position. When he looked up there was nobody around him. He saw Rukavina walking to his left, putting his gun away behind his back at the waistline, using his left hand. He did not know how much time had elapsed between the time he first heard the shot and the time he first saw Rukavina with the gun in his hand put-

ting it away. No one was there; Doherty was not there; neither was Guzman. He thought he asked Rukavina why he shot him, saying, "Why did you shoot me? I'm going to get you." Rukavina snickered and walked away, saying, "You'll be getting me, all right." Golin never saw the gun on the concrete floor.

John Guzman's testimony was as follows. He and Golin were in the pit when he first saw four or five inspectors arrive. He had known Rukavina for around 20 years, but he did not know that Rukavina was a building inspector at that time. He also knew Vrdolyak, but he did not know that he was an inspector. Both Vrdolyak and Rukavina were dressed in street clothes. He heard Vrdolyak threaten to shut the job down. Golin said, "Well, you can't. You're not an elevator—you have to be an elevator inspector" or something to that effect.

While Guzman was still in the pit he heard voices above him. He next heard a struggle, but he never saw how it began. When he got to ground level he heard another conversation between Golin, Rukavina and Vrdolyak. Owen Doherty was restraining Vrdolyak, holding him back with his hands. Guzman saw Doherty looking at the struggle. Rukavina was punching Golin. Rukavina had Golin by the back of the neck, and he was giving him uppercut hook shots. Rukavina had his left arm over the shoulder or head of Golin and was striking him with an uppercut with his right arm. He saw Rukavina strike two blows.

Guzman grabbed Rukavina and tried to pull him off Golin. Golin was just about on his knees. Guzman grabbed Rukavina around the shoulders and neck. He next heard a shot; he did not see a weapon anywhere when he heard the shot. He never saw a gun before the shots were fired. When the shot went off, all three of them were together, combined. It went off during the time Guzman was trying to pull Rukavina off Golin.

After the shot, everything stopped; he and Rukavina jumped up. Golin was still on the ground. He never saw the weapon on the ground at any time before the shooting. He did not see Rukavina pick the gun up off the floor. He did not know whether Rukavina might have picked the gun up off the ground. After the shot Guzman stepped back; he looked at Golin and then Rukavina. Rukavina looked at him "in disbelief." He had a gun in his hand. After the shooting Rukavina pointed his gun at Guzman. He asked Rukavina why he had shot Golin, and Rukavina said it was an accident. Rukavina never said that his gun had fallen to the ground. He put the gun away, behind his back, saying that it was a mistake; it was an accident.

Guzman left and went about one-half block to a garage and called 911. The police arrived before he returned to the scene. There were no gashes or lacerations on Golin's face. His lips were swollen and his eye was bruised. During the cross-examination of Guzman the following occurred:

"Q. You never saw [Rukavina] shoot anyone, did you?

A. Well, I know he didn't shoot him."

Owen Doherty testified as follows. He had known Golin for about 13 years and had worked with him frequently before October 10, 1982. Golin was his immediate boss. Doherty knew that Rukavina and Vrdolyak were both city ironwork inspectors. He had seen them on other sites before. Those would be the same sites on which he worked with Golin. It was possible that Rukavina and Vrdolyak had inspected sites on which Guzman had worked in the past.

Another building inspector, James Orlando, had come to the site before either Vrdolyak or Rukavina. Vrdolyak and Rukavina came together. Vrdolyak left for a couple of minutes and came back again with Rukavina. Orlando had already left; he did not tell Doherty where he was going. He overheard conversations between Vrdolyak, Rukavina and Golin. Vrdolyak and Rukavina wanted to get up on the building. Golin advised them that they could not go up for about 20 minutes. Vrdolyak threatened to shut the job down. Vrdolyak asked Golin if he knew who he was; Golin replied that he didn't "give a damn" who Vrdolyak was and advised Vrdolyak that no one was going to shut the job down.

Golin was standing at the machine room. Rukavina went to open one door, and he got into the machine room. They exchanged words and got into a scuffling match. They got a hold of each other and wrestled backwards. Rukavina started the scuffle. He did not see Rukavina strike Golin in the head; they were just scuffling; they were on the ground. Vrdolyak was standing along the wall and shouted that nobody was going to beat up his buddy; he wanted to help Rukavina. Doherty got a hold of Vrdolyak and told him that he wasn't going anyplace. Doherty was holding Vrdolyak against the wall with his back toward the scuffle. When Doherty heard the shot, he was about 8 to 10 feet away from Golin and Rukavina, who were on the ground. Guzman was trying to separate them. He first realized that the sound he heard was a shot after he heard either Golin or Guzman say, "Why did you have to shoot him?" Rukavina said it was an accident.

After Guzman ran off for help, Doherty saw the gun on the ground; it was the first time he had seen the gun. About ten seconds elapsed between the time Doherty heard the shot until he actually

saw the gun on the ground. He did not know whether it had fallen to the concrete. At the time Doherty noticed the gun on the concrete floor, Rukavina was still on his knees; he was crunched down. He saw Rukavina pick the gun up and put it back under his waistband or belt. Doherty did not know if the gun was in a holster. He never saw Rukavina point the gun toward anyone after Doherty turned around when he heard the shot. After Guzman left, Doherty heard Golin ask, "Why did you have to shoot me?" Rukavina said, "It was an accident." He never saw any cuts on Golin's lip or bruises or open wounds on his face.

Richard Harold, a co-worker and friend of Golin's, and Joy Golin, the plaintiff's wife, testified that the plaintiff's lip was swollen. Harold also said that Golin had cuts.

All the witnesses who testified for the defense were called by the City of Chicago. James Orlando, a building inspector, testified that he was called to work on Sunday, October 10 by his supervisor, Peter Vrdolyak. At about 3 p.m. he and Vrdolyak went to One Magnificent Mile to investigate the fall of a crane hook from a building. When they arrived at the jobsite, Orlando and Vrdolyak looked around for an elevator to ride to the roof to inspect the crane. Seeing Golin and Guzman in the elevator pit, they identified themselves with their city credentials and informed them that they were inspectors. Vrdolyak asked how they could gain access to the roof, and Golin said there were no elevators to be taken to the roof. Orlando and Vrdolyak each repeated the question, to which Golin responded, "There is a cable here. You could grab it and pull yourself up." When Vrdolyak again asked how to get to the roof, Golin swore at him and told him, "Don't bother me." At that point Vrdolyak ordered work stopped on the jobsite and directed Orlando to call the police. As Orlando was leaving to call the police, he met other building inspectors on the site, Rukavina and Nick Fera. Orlando called the police and awaited their arrival. When the police arrived, Orlando directed them to the elevator pit. He did not hear a shot nor did he observe the incident.

Nick Fera testified that on October 10, 1982, he was the first deputy commissioner of the department which enforces the City's building code. He was directed by his superior to go to the construction site at One Magnificent Mile to meet with Vrdolyak and to investigate the fall of a crane hook. When he arrived he saw Rukavina preparing to go into the jobsite. Fera also spoke with Orlando. He went to the elevator pit and spoke to Vrdolyak and "two gentlemen" that were in the pit. Fera identified himself to the workers in the area, including the men in the pit; he then had a conversation with the men in the

pit. He told them that the job was shut down, and one of the men in the pit swore at him and said, "Nobody is shutting this job down." Because Fera viewed the situation as "out of control," he told Vrdolyak that he was going to call the police. Fera then left the area to call the police. When he got to Oak Street a squad car had pulled up; he assumed it was the squad that Orlando had called. Fera returned with the police to the area where he had left Vrdolyak not "more than a couple of minutes" after he had gone to summon the police. He did not witness the fight between Rukavina and Golin.

Peter Vrdolyak testified that he was the assistant director of technical inspections and went with Orlando to investigate the fall of a hook. Before going to that location he called Rukavina at home and told him to go to One Magnificent Mile to see what had happened there. Upon his arrival at the construction site, Vrdolyak identified himself to various workers. He went to the personnel hoist to get a ride up to the top of the building. He asked Doherty for a ride to the top, and Doherty said that the personnel hoist was down. Vrdolyak then asked for a ride on the material hoist. While he was talking to Doherty he was standing "at the edge" of the elevator pit. Two men were in the pit at the time. One of them, Golin, directed vulgar language at him. Because they were interfering with his work, he announced that he was shutting down the job and directed Orlando to call the police. At about that time Fera came to the site and Vrdolyak told him that he "was getting all kinds of abuse on the job, and [he] had shut the job down and [he] had sent Mr. Orlando to get the police." Golin then climbed out of the elevator pit and again directed vulgar language at him. Fera responded by stating, "This job is shut down. I'm going to get the police."

Rukavina approached and said to Golin, "Take it easy, [the police] are on their way." Golin then swung at Rukavina and hit him in the face. Both of them started grappling and fell to the ground. Rukavina was on top of Golin. Guzman then jumped on top of Rukavina and started pummeling him. Vrdolyak went over and grabbed Guzman, and Doherty grabbed Vrdolyak and threw him against a wall. He saw Guzman on top of Rukavina pulling him up by the waist. Doherty pushed Vrdolyak back against the wall, and he heard a loud bang. About a second or two after the shot, Vrdolyak saw a gun on the ground, about four or five feet away from Rukavina. A holster was also on the ground. Vrdolyak saw Rukavina put the gun in the holster and put it in his waistband. At that time Golin said to Rukavina, "I'll get you. *** You shot me." Rukavina responded, "It was an accident."

Chicago detective Phillip Mannion was assigned to investigate the occurrence. He testified that he interviewed Golin at the hospital and observed no injuries to Golin's face. Golin told him he never saw a gun nor did he see Rukavina holding a gun. Golin told him that a shouting match occurred between him and Rukavina, they began fighting, and he had fallen to the ground with Rukavina on top of him. At that time he heard a shot and realized he had been shot. Mannion also interviewed Guzman, who said he saw Golin and Rukavina wrestling on the ground and holding on to each other. Guzman said he attempted to pull Rukavina off Golin at which time he heard a shot. Mannion interviewed Rukavina, who said the gun had fallen accidentally, hit the concrete and discharged.

Mannion examined the gun and observed that the cylinder was "jammed" and that there appeared to be concrete in the serrations on the hammer of the gun. He had learned that the ground at the site was concrete, and he concluded that the gun striking the concrete had caused the gun to discharge. After reviewing crime laboratory reports concerning the gun, he closed the case as an "accident."

William Tyrell, an employee of the Chicago Police Crime Detection Laboratory, testified that he found cement particles in the serrated portion of the hammer of the gun which were "similar in type" to cement particles taken from the floor at the site of the incident.

Chicago police firearms examiner Ernest Warner testified that he examined the gun recovered from Rukavina. Warner determined that the safety that was designed into the weapon was not functioning because the safety lever which constitutes a barrier in front of the hammer was not properly connected. Because of the malfunctioning of the safety, it was "very possible the user would not know whether the safety was engaged or disengaged." He was asked to ascertain if the weapon would discharge in a manner other than was intended by the manufacturer, that is, whether the weapon could accidentally discharge in a way that it was not designed to do. It was his opinion to a reasonable degree of scientific certainty that a "moderate blow struck to the hammer of [the] weapon when the hammer is at rest and the trigger is not touched at all will cause the weapon to discharge."

Many months before trial, the motion judge had entered an order as a discovery sanction barring Rukavina from testifying. Just before the trial began, Rukavina moved to vacate that order, and his motion was denied. After the City rested, Rukavina renewed his motion to vacate the order barring him from testifying. His motion was denied, and the judge directed Rukavina's counsel not to raise the issue be-

fore the jury. Rukavina then rested without calling any witnesses. The plaintiff did not call any rebuttal witnesses.

In addition to the general verdict finding in favor of the plaintiff, the jury answered special interrogatories as follows:

> "Q. Were the defendants guilty of willful and wanton negligence at the time of this occurrence?
>
> A. No.
>
> Q. Was John Rukavina in the scope of his authority at the time of this occurrence?
>
> A. Yes.
>
> Q. Was John Rukavina guilty of willful and wanton conduct at the time of this occurrence?
>
> A. Yes."

Rukavina assigns several errors. He maintains that his motion for judgment *n.o.v.* should have been granted; alternatively, that a new trial should have been granted; that the jury answered special interrogatories that are inconsistent with the general verdict and should control; that Rukavina was improperly barred from testifying; that the plaintiff's attorney engaged in misconduct which deprived Rukavina of a fair trial; that the judge erred in permitting the introduction of certain evidence and permitting a deformed bullet to go to the jury; and that the damages awarded were excessive.

■ This is a factually confusing case. For reasons to be explained later, we find it to be confusing procedurally as well. Our first task, however, is to pass on Rukavina's argument that the judge erred in denying his motion for judgment *n.o.v.*, or alternatively, his motion for a new trial. Because both motions are based on the allegation of insufficiency of the evidence to establish willful and wanton conduct, we will treat them together. We are mindful, however, that the supreme court has noted the distinction between the motions:

> "We have rather carefully preserved the distinction between the evidentiary situation which will require a new trial (verdict against the manifest weight of the evidence [citation]), and that justifying direction of a verdict or judgment *n.o.v.* There is, in our judgment, excellent reason for so differentiating to be found in the radically different results of allowance of the two motions, and we believe a more nearly conclusive evidentiary situation ought to be required before a verdict is directed than is necessary to justify a new trial. It is not our intention by this opinion to alter this concept." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 509-10, 229 N.E.2d 504.)

In *Keen v. Davis* (1969), 108 Ill. App. 2d 55, 246 N.E.2d 467, the court held that in determining the propriety of a ruling on a motion for judgment *n.o.v.*, a reviewing court is confronted with a question of law, while in reviewing an order ruling on a motion for a new trial, the standard is whether the trial court abused its discretion.

■ Out of all the evidence, agreed or disputed, the record establishes that Rukavina and the other inspectors were lawfully on the jobsite investigating a potentially serious accident. Doherty knew that both Vrdolyak and Rukavina were building inspectors; they had been on other jobsites when Doherty was working with Golin. Fera and Orlando testified, without rebuttal, that they had identified themselves to Golin and Guzman as inspectors, informed Golin that the job was going to be shut down and went to call the police. Golin and Guzman admitted that Vrdolyak told them that the job was going to be shut down. It defies reason to conclude that Golin and Guzman were not aware that Vrdolyak and Rukavina were city inspectors. Who else would be talking about shutting a job down? Guzman's testimony makes it clear that Golin had no intention of obeying Vrdolyak because Vrdolyak was not an elevator inspector. Doherty testified that Golin told Vrdolyak he didn't "give a damn" who Vrdolyak was and that no one was going to shut the job down. Golin himself testified that he called Harold on the radio and told him "there's some guy here who *says he's an inspector* and says we are going to go to jail if I touch the elevator button." (Emphasis added.) In spite of that, Golin did operate the elevator. Golin explained that he thought Vrdolyak was an inspector "with peco Crane [*sic*]."

We judge that any factual conclusion that Golin and Guzman were not aware that Rukavina and Vrdolyak were city inspectors is against the manifest weight of the evidence. By this observation we do not suggest that the fact that Golin and Guzman were aware of Rukavina's position is conclusive. It is, however, probative on the question of the weight to be given to the testimony of Guzman, who is, as the plaintiff concedes, the key witness.

We will accept the plaintiff's argument that the question of who started the fight is one of fact and that a determination by the fact finder that Rukavina started it is not against the manifest weight of the evidence. But the fact that Rukavina may have started the fight also is not conclusive. The trial judge ruled at the close of the plaintiff's case that the plaintiff had failed to establish that the shooting of the plaintiff was due to Rukavina's willful and wanton conduct; consequently, he directed a verdict on count III, which was at that time the only count alleging willful and wanton conduct. He later changed his

mind and allowed counts I and III to be amended to allege willful and wanton conduct. He based his ruling on his belief that if the jury found that Rukavina had struck the first blow, that finding could support a verdict for willful and wanton conduct. We disagree with the judge's reasoning, and the plaintiff does not urge that position in this court (nor did he in the trial court).

Boiled down to its factual essentials, the issue is whether the evidence supports a conclusion that Rukavina had the gun in his hand at the time the gun went off. For if the gun fell on the concrete and was discharged as a result, it is our judgment that willful and wanton conduct had not been established as a matter of law. The plaintiff suggests that willful and wanton misconduct "may" be established by the failure of the plaintiff to discover the malfunctioning safety on the gun or by the fact that the defendant was carrying a loaded gun onto a building site and then getting into a fight when "he *may* have been aware that the safety device on the gun was not functioning properly." (Emphasis added.) There is no evidence that the defendant was aware that the safety device on the gun was not functioning. Moreover, we reject the plaintiff's suggestions for two reasons: we disagree that those actions by the defendant would support a finding of willful and wanton conduct; and those were not the theories of recovery alleged in the complaint or argued to the trial court.

■ Before discussing the quantum of evidence required, it is appropriate to discuss the burden of proof. All agree that the plaintiff must prove that it is more probably true than not true that the shooting occurred in the manner claimed by the plaintiff. In this case, that means that the plaintiff must prove that it is more probably true than not true that Rukavina had the gun in his hand before it discharged. The plaintiff pinpoints the issue in his brief: "The point to be gotten is that only proof of *how* the gunshot occurred is inferential, and thus was properly left to the jury to determine." (Emphasis in original.) The plaintiff thus concedes, as he must, that this is a circumstantial evidence case. Negligence may be shown by circumstantial evidence. (*Mort v. Walter* (1983), 98 Ill. 2d 391, 457 N.E.2d 18.) Circumstantial evidence need not both create a reasonable inference of the fact to be shown and also exclude all other possible inferences. (*Illinois Bell Telephone Co. v. Purex Corp., Ltd.* (1980), 90 Ill. App. 3d 690, 413 N.E.2d 106.) Liability, however, cannot be based upon surmise or speculation as to what might have happened to cause the plaintiff's injury. (*Monaghan v. DiPaulo Construction Co.* (1986), 140 Ill. App. 3d 921, 489 N.E.2d 409.) In order to establish the element of proximate cause, the plaintiff must demonstrate with reasonable certainty

that a defendant's alleged conduct or omissions caused the plaintiff's injury. *Whitman v. Lopatkiewicz* (1987), 152 Ill. App. 3d 332, 504 N.E.2d 243.

We come now to the testimony of the key witness, John Guzman. As the plaintiff's attorney told the court at the hearing on the post-trial motion, "the jury obviously based their decision" on the testimony of "Guzman[,] who was right there and heard the shot and a second or two later saw the gun in the hand of the defendant."

■ We recognize that a reviewing court may not substitute its judgment for that of the jury in determining the credibility of witnesses or the weight to be given their testimony. That does not mean, however, that a reviewing court must turn a blind eye to the obvious and inherent infirmities of a witness' testimony. (*cf. Pedrick*, 37 Ill. 2d at 511.) We believe that Guzman's testimony does contain some inherent infirmities, and it is not consistent with other evidence offered by the plaintiff.

■ First, as we have previously noted, it is unreasonable to accept Guzman's testimony that he was unaware that Vrdolyak and Rukavina were city inspectors. Second, his testimony is not consistent with the testimony of Doherty, who said that he saw the gun on the concrete floor *after Guzman left* and while Golin was still on the ground. Doherty also testified that he never saw the defendant point the gun at anyone. Golin never testified he saw Rukavina point the gun at anyone. Doherty said he saw no blows struck and that Golin and Rukavina were scuffling, holding each other and wrestling backwards. Guzman testified that Rukavina had his left arm over the shoulder or head of Golin and was striking him with his right arm. When the shot went off, Guzman was trying to pull Rukavina off Golin. All three of them were "combined." Guzman's own testimony, in our judgment, establishes the improbability that the gun was in Rukavina's hand when it discharged. It is consistent with what Guzman told Officer Mannion: Golin and Rukavina were wrestling on the ground and holding on to each other; he attempted to pull Rukavina off Golin when he heard the shot.

Last, we point out that on cross-examination Guzman testified that he knew that Rukavina had not shot Golin. No attempt was made on redirect to have Guzman explain his testimony. The plaintiff now tells us that the testimony may be a misstatement or error of the court reporter. We cannot accept that explanation. The authenticated record before us imports verity and is the sole conclusive and unimpeachable evidence of proceedings of the lower court. *Kazubowski v.*

*Kazubowski* (1970), 45 Ill. 2d 405, 259 N.E.2d 282. See also *Genck v. McGeath* (1956), 9 Ill. App. 2d 145, 132 N.E.2d 437.

The plaintiff attempts to explain the presence of cement particles in the hammer of the gun by suggesting that Rukavina could have dropped the gun "an instant after the shooting, in disbelief at what he had done, and then only a few moments later picked it up from the cement floor." Alternatively, the plaintiff argues, Rukavina "could have fired the gun and then dropped it as a result of the remaining motion of the struggle, before everything stopped." Doherty, however, testified that the gun was still on the ground almost 10 seconds after the shooting and after Guzman had left.

The plaintiff refers us to *Glover v. City of Chicago* (1982), 106 Ill. App. 3d 1066, 436 N.E.2d 623. We believe *Glover* is distinguishable. In that case it was undisputed that an officer took his gun out of his holster and dropped it. There is no proof in this case that Rukavina took the gun out before it landed on the concrete floor.

The position we take here is consistent with the position taken by the supreme court in the landmark *Pedrick* case, in which the court pointed out the weaknesses in the testimony of the plaintiff's witnesses. It described the plaintiff's evidence as "highly equivocal" and of "dubious probative value." (*Pedrick*, 37 Ill. 2d at 511.) The court concluded, as a matter of law, that all of the evidence, viewed most favorably to the plaintiff, so overwhelmingly favored the defendant that no contrary verdict based on the evidence could ever stand. We so conclude in this case.

To sum up, the defendant was not violating any law while carrying the gun; he was in the performance of his duties; the plaintiff defied the city inspectors to the point that they had to call the police; a fight broke out; no one saw a gun before or during the fight; the plaintiff's principal witness, Guzman, saw Rukavina using both hands during the fight and did not see a gun; Rukavina, Golin and Guzman were all on the ground when the shot went off; Doherty saw the gun on the ground several seconds after the shot; the unrebutted expert testimony established that the gun could have discharged when the hammer came in contact with the concrete floor; and the hammer did come in contact with the concrete floor. To counter all this evidence, the plaintiff relies on the testimony of Guzman that he saw the gun in Rukavina's hand a few seconds after the shooting and that Rukavina pointed the gun at him.

To accept the plaintiff's argument that Guzman's testimony on this narrow point means that we must ignore all the other evidence, including the testimony of the plaintiff's own witness, Doherty, and

the other testimony of Guzman himself that Rukavina was using both hands to hold and to strike Golin. We believe under the *Pedrick* standard that all the evidence must be considered, not just the testimony of Guzman. As a matter of law, we hold that the evidence fails to establish a reasonable certainty that the gun was in Rukavina's hand at the time it was discharged. To accept the plaintiff's argument that the equivocal and contradicted testimony of Guzman is sufficient to overcome all of the other evidence introduced, including the testimony of the police experts, would be a reversion to the "scintilla-of-evidence" rule overruled in *Pedrick*. For that reason, the order granting judgment *n.o.v.* on count I is affirmed.

As we noted before, this case is procedurally confusing. We referred to the judge's ruling granting a directed verdict on count III on the ground that the plaintiff had failed, as a matter of law, to show that the shooting was the result of willful and wanton misconduct. The judge later changed his mind and allowed the case to go to the jury for a reason with which we disagree.

More confusion arose with the jury verdict. The jury had answered one interrogatory that Rukavina was in the "scope of his authority at the time of the occurrence" and another interrogatory that Rukavina was guilty of willful and wanton conduct at the time of the occurrence. Despite those specific findings the jury, in effect, inexplicably returned a verdict for the City of Chicago. The verdict is inconsistent with the special interrogatories.

The record is also confusing as to the reasons for the judge's granting judgment *n.o.v.* on count I and denying it as to count III. After the judge had granted judgment *n.o.v.* on count I, the parties appeared and argued what order could be appropriately entered. At one point Rukavina's attorney was arguing that there could not be any award for compensatory damages of $150,000 since judgment *n.o.v.* had been granted on that count. The judge raised the question of whether punitive damages would lie where compensatory damages did not. (The answer to the question is that punitive damages will not lie in the absence of compensatory damages. See *Sorkin v. Blackman, Kallick & Co., Ltd.* (1989), 184 Ill. App. 3d 873, 540 N.E.2d 999.) We note that both parties told us in oral argument that the judge's reason for granting judgment *n.o.v.* on count I was based on his interpretation of the rule of *respondeat superior*. We are not certain that that was the only reason he expressed. It is true that the judge said that the reason he was "allowing the *n.o.v.* on count I is because of the agency question." However, he also later said the following:

"My ruling on count I has nothing to do with the jury's finding of scope [of authority]. Mine is based upon the proposition that the burden of proving willful and wanton, at first count I, was lacking."

■ In any event, the judge finally concluded that count III embraced a prayer for compensatory damages. We disagree. Count III prayed only for punitive damages. Therefore, if the plaintiff's claim for compensatory damages must fall, so must his claim for punitive damages. Moreover, as we have explained, the claim for punitive damages must fall for the additional reason that the evidence fails to establish willful and wanton conduct on the part of Rukavina.

Because we conclude that the evidence, as a matter of law, is insufficient to sustain any finding of willful and wanton conduct, we judge that the appropriate order is to affirm the order granting judgment *n.o.v.* on count I and to reverse the order denying judgment *n.o.v.* on count III. Remandment for a new trial on either count would be inappropriate.

Judgment affirmed in part and reversed in part.

RAKOWSKI, P.J., and LaPORTA, J., concur.