NORMAN MITCHELL, Plaintiff-Appellee, v. RICHARD J. ELROD *et al.*, Defendants-Appellants.

First District (6th Division)    No. 1—93—1175

Opinion filed September 8, 1995.

Jack O'Malley, State's Attorney, of Chicago (Karen A. Covy, Patricia Shymanski, Sara Dillery Hynes, and Christine DeGraff Dawson, Assistant State's Attorneys, of counsel), for appellants.

Rufus Cook and Barbara Revak, both of Cook Partners Law Offices, Ltd., of Chicago, for appellee.

JUSTICE EGAN delivered the opinion of the court:

This is an appeal by the defendants from a jury verdict in favor of the plaintiff, Norman Mitchell, for personal injury suffered by him while he was a prisoner at the Cook County jail (Jail).

The plaintiff alleged in his complaint that he was raped in the Jail in August 1981. He named as defendants Cook County on a theory of *respondeat superior* and six others, individually and in their official capacities: Richard Elrod, the then sheriff; Philip Hardiman, the executive director of the Cook County Department of Corrections; Robert Glotz, the assistant director of security for the Jail; Richard English, the assistant superintendent of division I of the Jail; Lorenzo Fowler, a shift commander at the Jail; and Andre Weaver, a guard at the Jail.

The jury found that Fowler and Weaver were not liable; it found that the other named individual defendants were not liable for compensatory damages but fixed punitive damages of $40,000 against Elrod; $35,000 punitive damages against Hardiman; $25,000 punitive damages against Glotz; and $10,000 punitive damages against English. The jury also assessed $1,100,000 in compensatory damages against Cook County. The defendants' principal arguments are that the verdicts are inconsistent; that the evidence failed to establish as a matter of law willful and wanton conduct on the part of the individual defendants; and that Cook County may not be held liable under a *respondeat superior* theory for actions of the sheriff and his employees.

In August 1981, the defendant had just been convicted of robbery and sentenced to six years' imprisonment. The sentence was to run concurrent with another felony conviction, the nature of which is not disclosed in the record. He was placed in division I, tier D3, of the

Jail to await the weekly shipment to the Illinois State Penitentiary. This division housed felons who had been convicted and were awaiting shipment to the State penitentiary, those who had been charged with serious crimes and those who were disciplinary problems.

The defendant was born in 1961, was 5 feet 7 inches tall and was not a member of a gang. In addition, a psychological evaluation that resulted from a 1978 theft conviction in Lake County, Illinois, indicated that he was borderline-retarded due to head injuries in his childhood. When he was arrested on robbery charges in 1980, he was again given a psychological evaluation at the Jail by the Cermak Mental Health Institute that showed he was retarded, had "persecutory delusions," had hallucinations and had attempted suicide in 1978. As a result of this evaluation, he was placed in the "Residential Treatment Unit" (RTU) of the Jail, where there were more officers to supervise inmates and the inmates lived in a dormitory rather than in cells. The defendant left the RTU when his mother posted bond. He remained on bond until his conviction on the robbery charges.

After his conviction, the plaintiff was placed in division I on August 3. Upon arriving in the division, he received no psychological evaluation, although this is required by the Illinois County Jail Standards and the Jail's own regulations. Personnel from the Cermak Medical Health Institute were responsible for performing these evaluations on inmates in the receiving room of the Jail. The Cermak Institute (or Hospital) is located in division II of the Jail.

The floor of division I, where the plaintiff was assigned, consisted of two wings, or "tiers," of 19 cells; each wing had its own dayroom. A guard's office was between the two dayrooms and separated from them by bars. From the guard's office between the dayrooms, a guard could not see into the cells, but every half hour, the guard was supposed to leave the office and walk along the catwalk adjacent to the cells, from which he could see into the cells.

The plaintiff alleged that, when he arrived in division I, no Jail official gave him a cell assignment, but rather an inmate, Michael Veal, assigned him to a cell with another inmate, Douglas Montgomery. (Later defense testimony was that it would be against Jail policy for an inmate to assign another inmate to a cell.)

The plaintiff alleged that on August 4 Veal raped him. After the rape, the plaintiff went to the dayroom to ask a guard for help but there was no guard there. He returned to Montgomery's cell, where Montgomery hit him and "did oral sex first, then with [the plaintiff's] rear." After Montgomery was through with him, he was bleeding from his mouth and his "rear." The plaintiff testified that when he again went to the dayroom to ask for help Veal told the guard that

the plaintiff was lying and was his "bitch"; the guard told Veal and other inmates to take the plaintiff away and do what they wanted with him. The plaintiff did not tell the guard that he had been raped. (The identity of that guard was never established.) Veal, Montgomery and four other inmates then took the plaintiff to a cell where they all raped him. The plaintiff testified that he was later given the "okay," by either Veal or Montgomery or both, to tell the guards that he was sick. He did tell a guard that he was sick; Montgomery also told the guard that the plaintiff was sick and that the guard should take the plaintiff's "ass" off the floor. The guard and another officer took him off the floor, and at that time the plaintiff told one of the officers that he had been raped.

One of the inmates the plaintiff accused of raping him, Terry Perkins, testified that he did not assault the plaintiff; he did not see Montgomery or Veal assault him; and he did not hear a correctional officer tell Veal that he could take the plaintiff away and do what he wanted to him. Montgomery, however, testified that he saw Veal rape the plaintiff, that he himself had forced the plaintiff to perform oral sex on him and that the plaintiff had performed oral sex on a couple of other inmates. He did not testify that any guard said that the prisoners could do what they wanted to do to the plaintiff. After the alleged rape, Montgomery was convicted of burglary and aggravated battery and sentenced to 14 years' imprisonment. He was paroled and later convicted of aggravated criminal sexual assault and sentenced to eight years' imprisonment. He was serving that sentence when he testified.

The defendant Andre Weaver was the guard assigned to the 4 p.m. to 12 a.m. shift on August 4. Officer Weaver and the officer assigned as a "prowler" during Weaver's shift testified that they were not aware of any of the events the plaintiff alleged. It was against Jail policy for a guard to leave the office without permission for any reason other than the walks along the catwalk and for lunch. Jail policy required the guards to keep a log of who was on duty and of incidents in the division. There is no entry in the log book that indicates which officer replaced Officer Weaver when he went to lunch between 9 p.m. and 10 p.m. on August 4.

Weaver testified that the plaintiff handed him a note that said he had been raped. Weaver did not notice anything unusual about the plaintiff at this time. Weaver informed his shift commander, the defendant Sergeant Lorenzo Fowler, of the plaintiff's note, and Fowler directed Weaver to bring the plaintiff to the dayroom. (Fowler was deceased at the time of trial; his administrator was named as a defendant.) The plaintiff identified his attackers from pictures of the

inmates. The six inmates whom the plaintiff accused were transferred to segregation pending investigation; they received disciplinary reports for sexual abuse and gang activity; and the tier was placed on lock-down. On August 12, Veal and two of the other accused inmates were transferred to disciplinary segregation.

The plaintiff was taken to Cermak Hospital on August 5. The plaintiff testified that the doctors there did no more than give him a shot and some medicine. The emergency room record, which the plaintiff signed, stated that swabs and smears were taken from him and that there was no sign of injury or discharge in the plaintiff's rectal area. A physical examination two days later did not reveal any injury.

The plaintiff later told an investigator that he did not want to prosecute the alleged offenders for sexual assault, and he filled out and signed a complaint refusal form. The investigator questioned each of the alleged offenders and each one denied the plaintiff's allegations.

After leaving the hospital, the plaintiff spent the night in the RTU of the Jail and was transferred to the State prison in Joliet the next day. The plaintiff claimed that he was raped again on his second day at Joliet.

The plaintiff sued Cook County because it owned and, through the other defendants, operated the Jail. The plaintiff sued the other defendants in their individual and official capacities and alleged against them negligence and willful and wanton misconduct. In his claim against Elrod, Hardiman, Glotz and English, the plaintiff alleged that these men knew or should have known that the Jail was heavily populated with gang members who rape other detainees; and young, small and retarded detainees who are unaligned with a street gang had a substantial likelihood of being raped by these gang members. Because these individual defendants were responsible for developing, implementing or supervising the implementation of policies and regulations, the plaintiff claimed they were responsible for the following: (1) the failure to consider the plaintiff's mental history when making his cellblock assignment; (2) the failure to determine gang affiliation of inmates even though 90% are affiliated with gangs; (3) the failure to properly train, hire, supervise and assign correctional officers; (4) the failure to track and separate inmates with assaultive propensities; (5) the failure to adequately investigate assaults; and (6) the failure to use cells that are visually and aurally accessible.

The plaintiff claims that, as a result of the rapes at the Jail, he began having nose bleeds, had nightmares, began wetting the bed,

tried to hang himself in Joliet, and his wife divorced him because he "couldn't produce a sex act with [his] wife." He consequently asked for compensatory and punitive damages.

Before trial, the judge granted the plaintiff's motion *in limine* to exclude a laboratory report that indicated swabs taken from him at Cermak Hospital were negative for sperm or semen. (Montgomery was later permitted to testify over objection that a Jail officer told him the results of the test were positive for sperm. The Jail officer denied such a conversation with Montgomery.) The judge denied the defendants' motion *in limine* in part and allowed the plaintiff to enter into evidence reports of sexual assaults in division I in the year before his rapes. During trial, the judge denied the defendants' motion for a directed verdict and their three motions for a mistrial based on adverse publicity during the trial. The defendants assign all these rulings as error.

■ We will first address the defendants' argument that the jury's finding that the individual defendants were not liable for compensatory damages is legally inconsistent with the jury's finding that the named individuals are liable for punitive damages. Preliminarily, we reject the plaintiff's argument that the defendants have waived the right to question the sufficiency of the evidence to support a finding of willful and wanton misconduct on the part of the defendants, which would be the only basis for the imposition of punitive damages. The defendants raised the insufficiency of the evidence in their motion for a directed verdict as well as in their post-trial motion.

■ We agree with the defendants that it was legally inconsistent for the jury to award punitive damages but no compensatory damages against the four individual defendants. A long line of cases has held that punitive damages may not be recovered in the absence of compensatory damages. (See *Hackett v. Smelsley* (1875), 77 Ill. 109; *Kemner v. Monsanto Co.* (1991), 217 Ill. App. 3d 188, 576 N.E.2d 1146 (and cases cited therein); *Martin v. Leslie* (1900), 93 Ill. App. 44; see also *Golin v. Rukavina* (1991), 209 Ill. App. 3d 547, 568 N.E.2d 301; *Sorkin v. Blackman, Kallick & Co.* (1989), 184 Ill. App. 3d 873, 540 N.E.2d 999.) One of the two Illinois cases cited by the plaintiff, *Anvill Investments Ltd. Partnership v. Thornhill Condominiums, Ltd.* (1980), 85 Ill. App. 3d 1108, 407 N.E.2d 645, is factually inapposite; and the other case, *McNay v. Stratton* (1881), 9 Ill. App. 215, is simply an aberration, unsupported by any citation, and is contrary to the overwhelming weight of authority, which includes supreme court opinions.

■ The plaintiff also argues that the defendants waived the right to raise the inconsistency of the verdicts because they did not raise

the point at the time the jury returned its verdict and before it separated. (This was the trial judge's basis for rejecting the defendants' post-trial argument on this point.) There is authority for the plaintiff's position from other jurisdictions. (See, *e.g., Holmes v. Drakey* (Mo. Ct. App. 1988), 759 S.W.2d 610; *Thompson Drilling, Inc. v. Romig* (1987), 105 N.M. 701, 736 P.2d 979.) In one case, *Kriner v. Weaver* (1976), 276 Or. 741, 556 P.2d 652, the Oregon Supreme Court found waiver even though the verdict was returned in the absence of the trial judge, the parties' attorneys and the court reporter. The Oregon Supreme Court said that there was nothing to prevent the appellant's attorney from being present, and the judge was available by phone to return to the courtroom in the event of any irregularity. We have strong reservations about the fairness of this holding.

There is authority to the contrary. (See *Morris v. McCauley's Quality Transmission Service* (1976), 60 Cal. App. 3d 964, 132 Cal. Rptr. 37 (waiver rule not automatic and subject to many exceptions).) In some jurisdictions it has been held that the trial judge is obliged to correct an inconsistent verdict, regardless of the position of the parties. See *McInturff v. White* (Tenn. 1976), 565 S.W.2d 478; *Farm Bureau Mutual Insurance Co. v. Sears, Roebuck & Co.* (1980), 99 Mich. App. 763, 298 N.W.2d 634.

We have found no Illinois civil case directly in point. But in one criminal case, the supreme court held that when inconsistent verdicts are returned, it is the duty of the trial judge to apprise the jury of the inconsistency and to send the jury back for further deliberation. *People v. Spears* (1986), 112 Ill. 2d 396, 493 N.E.2d 1030.

We see some problems with acceptance of a rule that an appellant waives the right to raise the inconsistency of verdicts on appeal by failure to raise the inconsistency before the jury separates. Jury verdicts are often returned late at night and almost always under some degree of heightened emotions. The very question of inconsistency is not always easily resolved. (*Cf. Kemner v. Monsanto Co.* (1991), 217 Ill. App. 3d 188, 576 N.E.2d 1146 (discussion of whether verdict of $1 for compensatory damages was sufficient basis for an award of $16,250,000 in punitive damages).) By agreement of the parties, many verdicts are returned signed and sealed by the jurors; and the verdict is made known to the judge and the parties the following day after the jury has separated and, if their jury service has been completed, the jury has been discharged. Under such circumstances, a holding of waiver would be unfair. Moreover, we have some question about placing the burden on only one of the parties when inconsistent verdicts are returned.

But whether the waiver rule is applicable in this case we need

not decide because we have determined that the evidence is insufficient as a matter of law to establish willful and wanton misconduct on the part of the individual defendants that would support the imposition of punitive damages.

Punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) The punitive damages in this case must necessarily have been based upon a finding by the jury that the individual defendants were guilty of willful and wanton misconduct. Generally, whether the evidence establishes willful and wanton misconduct is a question of fact; however, if the evidence, viewed in the light most favorable to the plaintiff, does not tend to support the allegation of willful and wanton misconduct, the issue should not be submitted to a jury. (*Partipilo v. DiMaria* (1991), 211 Ill. App. 3d 813, 570 N.E.2d 683.) It is our duty, therefore, to determine whether the facts of this case justify the imposition of punitive damages. We wish to make it clear that the issue we are to consider is not whether some personnel of the Jail were negligent; the issue is whether the plaintiff proved the individual defendants were guilty of willful and wanton misconduct.

It has been stated that willful and wanton misconduct " 'approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.' " (*Burke v. 12 Rothschild's Liquor Mart, Inc.* (1992), 148 Ill. 2d 429, 448, 593 N.E.2d 522, quoting *Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 416, 563 N.E.2d 397.) The Restatement uses the word "reckless" in place of "willful and wanton." (Restatement (Second) of Torts § 500, Special Note, at 587 (1965).) Using that definition, the supreme court in *Burke* held that reckless conduct requires " 'a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.' " (*Burke*, 148 Ill. 2d at 449, quoting Restatement (Second) of Torts § 500, Comment *g*, at 590 (1965).) With those precepts as guidelines, we turn to the evidence and the theory of recovery advanced by the plaintiff.

The plaintiff introduced the evidence deposition of Dr. Sean McConville, a penologist and professor of criminal justice. He explained that classification and differential assignment of prisoners in jails and prisons is one of the basic tools of correct prison administration. Prison officials must, for example, separate men from women, the mentally ill from the mentally well and the sentenced from the

unsentenced. The American Correctional Standards, the Illinois Jail Standards and documents he reviewed from the Cook County Department of Corrections all require classification of prisoners and separate assignments on the basis of these classifications. He criticized the design of the Jail, which was built over 60 years ago.

The defendants have provided in their brief a recitation of the testimony of the individual defendants concerning their duties and practices. Elrod testified that, in order to insure the care of the inmates, he received on a weekly basis daily reports from the Department of Corrections which informed him of any incidents of sexual or other assaults that had occurred at the Jail; and he periodically went to the Jail personally. He ordered Hardiman to take measures to prevent assaults against prisoners. Elrod met with Hardiman on a weekly basis, and he was in telephonic communication with him two or three times a day. It was his policy that gangs would not be tolerated at the Jail and that gangs would not run the Jail. The correctional officers received training in the handling of gangs.

Hardiman was responsible for the day-to-day operations of the Department of Corrections. He was to confer with the staff to formulate established policies and regulations. Hardiman formulated policies in the form of memoranda and insured their distribution to all correctional officers. He issued a memorandum that stated:

> "The Cook County Department of Corrections at no time allows any inmate, control over another inmate. Correctional staff members are responsible for the safety and control of all inmates in order to maintain control and security. It is prohibited for any inmate to control, supervise, exert pressure or assume any authority over other inmates. If this is observed, disciplinary action will be taken, upon the receipt of the disciplinary report from the correctional staff member."

Hardiman also issued the following memorandum concerning staffing:

> "It is essential to have complete and full coverage of designated security posts, and full surveillance of all inmates. Under no circumstances, will an officer be moved from any post (already assigned to him/her), to perform any other function, if removal results in the post being left unmanned[;] preplanning will provide for back-up assistance for all officers entering inmate living quarters."

Hardiman issued another memorandum concerning the surveillance of inmates which states: "It is the responsibility of the correctional officer working with inmates of high or medium security risk, to observe the inmates in his/her charge at least every 30 minutes." Hardiman delegated the responsibility for the implementa-

tion of his policies to Director Glotz. Officers who failed to carry out these orders were subject to discipline.

Hardiman reviewed incident reports and investigative reports in order to keep track of what was going on in the Jail in terms of inmate assaults and conditions at the Jail. He had regular meetings with the chief investigator to review the problems that existed in the Jail and to review the investigation department's recommendations to correct the problems. Hardiman also testified to the extensive training a correctional officer receives.

Glotz's duties included the supervision of and responsibility for the security of the Jail and the supervision of the RTU and the receiving room. It was the responsibility of the Cermak Medical Heath Institute personnel in the receiving room to see to it that a psychiatric interview was performed on a new inmate. The Cermak personnel would make a determination as to the mental health of individual inmates and would be responsible for the placement of inmates in either Cermak Hospital, Cook County Hospital or the RTU.

New inmates who were sent to division I from the receiving room were placed on tier H4 pending an interview by various division I personnel to determine the type of tier in which that individual should be placed. The tiers in division I were classified into various types. In August 1981, tiers F2, F3 and F4 were designated for inmates who were believed to be aggressive. Various criteria were used to determinate an inmate's housing assignment, including: age, previous incarcerations, whether the inmate was a convicted felon awaiting shipment, and bond criteria. Because gang affiliation was not among the list of standards by which inmates were to be classified under the Illinois County Jail standards, housing decisions in division I were not made on gang membership. There was testimony that gang members comprised 90% to 95% of the prisoner population. The complaint alleged 90%.

Glotz testified that a prisoner who had been previously incarcerated in the Jail, released on bond and then later convicted and brought back to the Jail would go through the intake procedure again at the time of reincarceration in the Jail. Therefore, it would have been the responsibility of the Cermak Medical Health Institute personnel to perform another psychiatric evaluation of the plaintiff. The Cermak personnel did not report to Glotz. Glotz reviewed investigative reports to determine if there had been a breakdown in the operations under his command.

English was the superintendent of division I and was responsible for the supervision of division I activity. To fulfill his duties, English made himself accessible to the inmates by going to the various areas

of division I to talk with them and discuss any complaints they might have. He also checked out staff patterns and looked into troubled areas and the various areas of division I. He reviewed incident reports and disciplinary reports. If an inmate were transferred to division I for disciplinary reasons, a disciplinary report on that inmate would be placed in a folder in the security office of division I. Various officers in the division would be made aware of the report depending on its contents. It was English's policy to keep an officer on the same tier for a period of time because he felt that if the officer knew whom he was dealing with he could do a better job of handling those inmates.

The plaintiff's response to the defendants' argument that the evidence was insufficient is as follows:

> "That the individual Defendants 'did not know MITCHELL' *** hardly absolved these Defendants from liability, as the law provides that even constructive knowledge is sufficient to cause liability. The jury properly considered GLOTZ's 'I'm not a doctor, I'm not a prosecutor' statements; it properly considered HARDI-MAN's 'I did nothing' admission; it properly evaluated ELROD's 'charismatic leadership' and, like Dr. McConville, it concluded that supervision was totally lacking, and that abdication of responsibility was rampant."

The plaintiff's brief is of scant help to us in trying to pinpoint precisely how the individual defendants were guilty, not of ordinary negligence, not simply a failure to supervise, but of willful and wanton misconduct.

The thrust of the plaintiff's argument is that the plaintiff should have been rescreened by the Cermak Hospital personnel *and* that if he had been rescreened, he would not have been assigned to division I, *and* if he had not been assigned to division I, he would not have been assaulted.

We disagree with the plaintiff's contention that he would not have been assigned to division I if he had been rescreened. Hardiman testified that all convicted felons are in division I regardless of their "status *** with problems [or] without problems." In addition, we wonder what particular value a rescreening would have been. The first screening already showed the mental problems of the plaintiff. In addition, homosexual rapes took place in divisions of the Jail other than division I, a fact established by the reports the plaintiff sought to introduce. Finally, we note that requiring Jail authorities to segregate prisoners, as the plaintiff insists they must, presents a Herculean task. For example, the plaintiff argues that the plaintiff should not have been housed with gang members; but, we repeat, the

evidence was that gang members comprised at least 90% of the total population. In addition, the minimum standards cited by the plaintiff provide that "sentenced offenders shall be segregated from unsentenced offenders" and mentally or emotionally disturbed or retarded shall be housed separately. The plaintiff would be classified as both a sentenced offender and a retarded offender. Therefore, according to the plaintiff's argument, there should be another segregated group: mentally disturbed or retarded convicted felons.

But, for the purposes of our discussion, we will concede the validity of the plaintiff's argument. Consequently, we will also concede that the Cermak Hospital personnel did not do what they were supposed to do. In short, they made a mistake. How then may the mistake of the Cermak Hospital personnel be not only imputed to the individual defendants (even though that personnel were not under the control of the sheriff), but magnified to the point that they are to be found guilty of willful and wanton misconduct and liable personally for punitive damages? There is no showing of a general practice on the part of Cermak Hospital to ignore the regulation requiring screening; there is no showing of a longstanding disregard by the assigning personnel of the guidelines and regulations; and, most important, there is no showing of an awareness on the part of the individual defendants of any general disregard of the regulations. Certainly, they were not aware of it in this case.

Jailers are obliged to provide a prisoner with reasonable care (*Dezort v. Village of Hinsdale* (1976), 35 Ill. App. 3d 703, 342 N.E.2d 468); but neither the sheriff nor the other personnel under his control are insurers of the safety of the prisoners in their custody. In our judgment, the plaintiff has failed, as a matter of law, to establish willful and wanton misconduct on the part of the individual defendants. For that reason, the judgment against them is reversed. See *Golin v. Rukavina* (1991), 209 Ill. App. 3d 547, 568 N.E.2d 301.

■ The plaintiff now argues that, even if the verdict against individual defendants must fall, the verdict against Cook County may be affirmed on the ground that the Cermak Hospital personnel are clearly agents of Cook County and that their negligence in not rescreening the plaintiff set in motion the sequence of events that resulted in his injury. The defendants counter that the plaintiff has waived this argument for failure to plead responsibility on the part of Cook County for the actions of the personnel of Cermak Hospital.

The plaintiff raises two arguments to avoid waiver. He first contends that "[w]hile it is the law that an *appellant* is foreclosed from arguing on appeal a matter not raised in the trial court, the exact opposite is true as it relates to an appellee." (Emphasis in orig-

inal.) In support of that statement the plaintiff cites *Shaw v. Lorenz* (1969), 42 Ill. 2d 246, 246 N.E.2d 285. The second argument is that an objection that an issue not raised in the pleading may be waived by the conduct of the objecting party at the trial or the introduction of evidence on the point. In support of that argument the plaintiff cites *Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, 377 N.E.2d 21. We do not accept either of the plaintiff's arguments and disagree with the plaintiff's statement of the law that the rule of waiver may not apply to an appellee. In *Consoer, Townsend & Associates v. Addis* (1962), 37 Ill. App. 2d 105, 185 N.E.2d 97, the court referred to the rule that the theory upon which a case is tried may not be changed upon review even by the successful party to the suit. See also *In re Estate of Leichtenberg* (1956), 7 Ill. 2d 545, 131 N.E.2d 487; *Sherman v. Rokacz* (1989), 182 Ill. App. 3d 1037, 538 N.E.2d 898.

In *Shaw*, the plaintiffs sought to enjoin the defendant director of public works from closing a township road that gave the plaintiffs access to a highway. The complaint was dismissed. The defendant argued on appeal that the plaintiffs had an adequate remedy at law through a *mandamus* action. The plaintiffs argued that the defendant had not raised this argument in the trial court. The supreme court held that an appellee "may urge any point in support of the judgment on appeal, even though not directly ruled on by the trial court, so long as the factual basis for such point was before the trial court." (*Shaw*, 42 Ill. 2d at 248.) The court then pointed out that it was clear, and the plaintiffs conceded, that at the time the complaint was filed they had an action for *mandamus* against the defendants. In the case before us it is not clear, and the defendants do not concede, that the County is liable for the injuries subsequently suffered by the plaintiff because of the failure of the Cermak Hospital personnel to rescreen the plaintiff. Strong arguments could be made by the defendants as to the existence of a duty, foreseeability and causation.

In *Pioneer Trust & Savings Bank*, the other case cited by the plaintiff, the supreme court held that an objection that an issue was not raised in the pleadings may be waived by the conduct of the objecting party at the trial or by introduction of evidence on the issue. (See also *Mandolini Co. v. Chicago Produce Suppliers, Inc.* (1989), 184 Ill. App. 3d 578, 540 N.E.2d 505.) *Pioneer Trust* is of no solace to the plaintiff. In the case before us, the sufficiency of the evidence to support a verdict against the county based on the actions of the Cermak Hospital personnel was never raised by the plaintiff. Indeed, the plaintiff's complaint and the instructions submitted by the plaintiff make it clear that any alleged liability on the part of the county

depended solely upon a finding of negligence on the part of the individual defendants and no one else. The parties never proceeded as though the plaintiff had pleaded a cause of action against the county based upon the actions of the Cermak Hospital personnel.

Because the evidence is insufficient to establish willful and wanton conduct on the part of the individual defendants and all individual defendants have been found not guilty of ordinary negligence, the verdict against Cook County must also be reversed.

In view of our holding, it is unnecessary to discuss the other grounds for reversal urged by the defendants.

Judgments reversed.

RAKOWSKI and ZWICK, JJ., concur.